THW/mr

**STATE, ex rel. BEIL, Pros. Atty., Plaintiff, v. MAHONING VALLEY DISTRIBUTING AGENCY, INC., MID-TOWER PUBLISHING CORPORATION, Defendants.**

Common Pleas Court, Mahoning County.

No. 159612. Decided August 8, 1960.

Thomas A. Beil, Pros. Atty., Harold H. Hull, Asst. Pros., for relator.
Oscar B. Kaufman, Morris DeVorkin, Youngstown, Stanley Fleishman, Hollywood, California, for defendants.

## OPINION

By MAIDEN, J:

Sec. 2905.343 R. C., enacted by the 1959 Legislature and effective November 12, 1959, reads as follows:

"The court of common pleas has jurisdiction to enjoin the sale and distribution of obscene prints and articles, as specified:

"(A) The prosecuting attorney, the chief executive officer of a municipal corporation, or the chief legal officer of a municipal corporation, in which a person, firm, or corporation sells or offers for sale or distributes or is about to sell or distribute or has in his possession with intent to sell or distribute or is about to acquire possession with intent to sell or distribute any book, magazine, pamphlet, comic book, story book, writing, paper, picture, photograph, image, or any written or printed matter of an indecent character, which said prosecuting attorney or officer believes to be **obscene, lewd, lascivious, filthy, indecedent,** may maintain an action for an injunction against such person, firm, or corporation in the common pleas court to prevent the sale or further sale or the distribution or further distribution or the acquisition or possession of such article or articles.

"(B) The person, firm or corporation sought to be enjoined shall be entitled to a trial of the issues within one day after joinder of issue and a decision shall be rendered by the court within two days of the conclusion of the trial. If on the trial of the issues the court determines that the article is **obscene** the court shall enter a judgment or decree enjoining the sale or further sale or the distribution or the further distribution or the acquisition or possession of such article. Upon application of the plaintiff for a temporary restraining order pending the trial of the issues the court may forthwith restrain the defendant from selling or offering the same for sale until one day after joinder of issue. No bond shall be required to make said restraining order effective.

"(C) In the event that a final order or judgment of injunction be entered in favor of the petitioner, such final order shall contain a provision directing the person, firm, or corporation to surrender to the sheriff of the county any of the matter described in division (A) of this section, and such sheriff shall be directed to seize and destroy the same.

"(D) Every person, firm, or corporation who sells, distributes or acquires possession with intent to sell or distribute any of the matter referred to in (A) of this section and described in §§2903.10 and 2903.11, or §§2905.32 to 2905.41, inclusive, R. C., after service upon him of a summons and complaint in any action brought by such officer of any county,

city, village, or other political subdivision pursuant to this section is chargeable with knowledge of the contents thereof.

"(E) Any corporation not admitted to do business in this state which publishes and causes printed material to be sent into this state for ultimate sale at retail in his state thereby consents that it may be sued in any proceedings commenced pursuant to this section and that service may be made upon it by registered mail directed to the address of such corporation appearing on the printed material."

This statute is similar to the New York statute with some exceptions which will be pointed out, enacted in 1954, Book 66, Part 1, Annotated Laws of New York, Section 22-a, McKinney's 1954 Session Laws of New York, Chapter 702, Section 22-a. It is fair to assume, due to the similarity in language, that our Legislature in dealing with this subject matter used the New York statute as its basis. It will be noticed by reference to McKinney's, supra, that the provision for an injunctive order without notice was stricken from the New York statute before enactment, although the New York general injunction statute may operate to allow one.

Paragraph 2 of New York became the initial sentence of paragraph (B) of Ohio. It will be further noticed that under paragraph (B) of our statute the court shall enter a judgment or decree enjoining the sale or further sale or distribution of the article only upon a finding that the article is "obscene," while under the New York statute it is "in the event that a final order or judgment of injunction be entered in favor of such officer of the city, town or village and against the person, firm or corporation sought to be enjoined," that the final judgment contains a provision to surrender the material to the sheriff, etc.

Paragraph 1 of New York describes the written or printed matter which may be enjoined as "of an indecent character, which is obscene, lewd, lascivious, filthy indecent or disgusting. . . ."

It is to be noticed that our statute provides that the written or printed matter in order to be actionable against the defendant must be "of an indecent character, which said prosecuting attorney or officer believes to be obscene, lewd, lascivious, filthy, indecent. . . ."

"Lewd" is defined in Webster's New International Dictionary, Second Edition, as: "Lustful; libidinous; lascivious; unchaste."

"Lascivious" is defined as: "Wanton; lewd, lustful," or "Tending to produce voluptuous or lewd emotions." In view of the fact that the power of the court to issue an injunction is only upon a finding that the article or book is "obscene," these other words in paragraph (A) are not material in the case at bar. This case is, therefore, on a narrower basis than the broad general words of the New York statute, although that does not mitigate from the constitutionality of the New York statute, for the reason that the word "obscene" appears therein.

A temporary restraining order in the instant case was issued without bond upon the filing of a petition. No motion to dissolve the temporary restraining order was filed by the defendants, but the understanding between counsel was that the defendants would cease the distribution of the book until after trial and judgment in this case.

As will be gained from a discussion of the law herein, the court is of the opinion that the granting of a temporary restraining order without notice, and before the service of summons, is in violation of the constitutional rights of the defendants; whether the granting of a temporary restraining order, after service of summons, in accordance with paragraph (E) of the Code section, and after a hearing before the court is constitutionally valid or not, is thus not raised in this case and is not and cannot be passed upon by the court.

If the following portion of paragraph (B) "Upon application of the plaintiff for a temporary restraining order pending the trial of the issues the court may forthwith restrain the defendant from selling or offering the same for sale until one day after joinder of issue." be construed as giving the court power to issue the temporary restraining order ex parte, and before the service of summons, it is therefore **to that extent** constitutionally invalid; but only to that extent.

As noted above, the defendant, Mid-Tower Publishing Corporation of Fresno, California, filed answer jointly with the other defendant and voluntarily entered its appearance; consequently, any question as to the validity of service made upon a foreign corporation under paragraph (E) is not raised.

Also there is not raised any question as to the first sentence of paragraph (B) providing for trial within one day after joinder of issue and decision of the court within two days of the conclusion of the trial, inasmuch as all steps leading to joinder of issue, date of trial, time for filing briefs, oral arguments, and the submission of the case to the court for decision were all taken by joint agreement of counsel.

The New York statute was held to be constitutional in Kingsley Books, Inc. v. Brown, 354 U. S. 436, 1 L. Ed. 2d 1469, 77 S. Ct. 1325, decided June 24, 1957. In that case the complaint was dated September 10, 1954, and dealt with a book entitled "Nights of Horror." Defendants consented to the granting of an injunction pendente lite and upon trial did not raise the issue of any right to a jury trial. The trial judge found from the evidence that the booklets were clearly obscene and were "dirt for dirt's sake"; he enjoined their further distribution and ordered their destruction, but refused to enjoin the sale and distribution of later issues that might be published upon the ground that "to rule against a volume not offered in evidence would . . . . impose an unreasonable prior restraint upon freedom of the press. 208 Misc. 150, 167, 142 NYS 2d 735, 750."

The defendants did not challenge the construction of the statute or the finding of obscenity in the higher courts. Mr. Justice Frankfurter in the majority opinion pointed out that the defendants' attack is upon the power of New York to employ the remedial scheme of Section 22-a.

Quoting from the Opinion on page 440:

"Resort to this injunctive remedy, it is claimed, is beyond the constitutional power of New York in that it amounts to a prior censorship of literary product and as such is violative of that 'freedom of thought, and speech' which has been 'withdrawn by the Fourteenth Amendment from encroachment by the states.' Palko v. Connecticut, 302 U. S. 319,

326, 327, 82 L. Ed. 288, 292, 293, 58 S. Ct. 149. Reliance is particularly placed upon Near v. Minnesota, 283 U. S. 697, 75 L. Ed. 1357, 51 S. Ct. 625.

"In an unbroken series of cases extending over a long stretch of this Court's history, it has been accepted as a postulate that 'the primary requirements of decency may be enforced against obscene publications.' Id. 283 U. S. at 716., And so our starting point is that New York can constitutionally convict appellants of keeping for sale the booklets incontestably found to be obscene. Alberts v. California, decided this day (1 L. Ed. 2d 1498). The immediate problem then is whether New York can adopt as an auxiliary means of dealing with such obscene merchandising the procedure of Section 22-a."

The court continued on page 441:

"It is not for this Court thus to limit the State in resorting to various weapons in the armory of the law. Whether proscribed conduct is to be visited by a criminal prosecution or by a qui tam action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice . . . If New York chooses to subject persons who disseminate obscene 'literature' to criminal prosecution and also to deal with such books as deodands of old, or both, with due regard, of course, to appropriate opportunities for the trial of the underlying issue, it is not for us to gainsay its selection of remedies."

The Court pointed out that Near v. Minnesota, supra, "left no doubts that 'Liberty of speech, and of the press, is also not an absolute right,' 283 U. S. at 708, it likewise made clear that the 'protection even as to previous restraint is not absolutely unlimited' . . . . To be sure, the limitation is the exception; it is to be closely confined so as to preclude what may fairly be deemed licensing or censorship . . . . The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test. The duty of closer analysis and critical judgment in applying the thought behind the phrase has thus been authoritatively put by one who brings weighty learning to his support of constitutionally protected liberties: 'What is needed,' writes Professor Paul Freund, 'is a pragmatic assessment of its operation in the particular circumstances. The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis.' The Supreme Court and Civil Liberties, 4 Vand L Review 533, 539."

The Court holds that such a statute does not operate as a prior restraint. Coming now to the issue of whether the statute must fall because it does not provide for a jury trial, the Court holds that the injunctive method does not differ in essential procedural safeguards from that provided under many state statutes making the distribution of obscene publications a misdemeanor, and in which states the defendant is not thereby entitled to a jury trial. It is pointed out also that the consequences of a judicial condemnation for obscenity under Section 22-a are not more restrictive of freedom of expression than the result of a conviction for a misdemeanor. Further, the provision for the seizure and destruction of the instrumentalities of ascertained wrongdoing is a resort to a legal remedy sanctioned by the long history of the Anglo-American law. Also, Near v. Minnesota is distinguished because

under the Minnesota statute its courts were empowered to enjoin the dissemination of future issues of a publication because its past issues had been found offensive.

Mr. Justice Douglas, with whom Mr. Justice Black concurred, dissented for two reasons: First, the provision for an injunction pendente lite gives the State the paralyzing power of a censor; and, second, the procedure for restraining by equity decree the distribution of all the condemned literature does violence to the First Amendment, in that, for instance, a publisher found guilty in New York City acts on evidence which may be quite different from evidence before a court that finds a publisher not guilty in Rochester.

Mr. Justice Brennan dissented upon the ground that the absence of an express right to a jury trial was a fatal defect.

In order to understand this book it is necessary that it be read, and read carefully. This the court has done three times, once in preparation for trial, again in studying the law applicable to the case, and again in the preparation of this opinion.

The cover depicts the two police officers while on a prowl out in the country finding their Chief of Police in the act of sexual intercourse with the judge's wife, with the notation that "This was no ordinary necking party they'd broken up. Before them stood their enraged boss—the Chief of Police—and some woman."

Preceding the frontispiece is a page quotation written by the author, depicting the actions of Jim and a lady friend as well as conversation preceding the retreat into the bedroom for illicit relations.

The story part of the book covers 147 pages, and following that are five additional sheets of advertising by the publisher and a presumably associate publisher of other similar books, with excerpts depicting relations between a man and a woman of either an illicit sexual nature or leading thereto.

There is nothing about the format and composition of the volume, the advertising and promotional material, and the whole approach to publication to treat the book as a serious work of literature, as was found by Judge Bryan of Lady Chatterley's Lover by D. H. Lawrence. Grove Press, Inc. v. Christianberry 175 F. Supp. 488 (DC N. Y. 1959). Affirmed in    F. 2    28 United States Law Week 2486 (March 25, 1960).

The opposite conclusion may well be drawn as to this book in question.

As to the story, it is difficult to purvey in a few words the sexual orgies had by the two principal characters through the various chapters of the book; thirteen out of the fifteen vividly display acts of illicit sexual relations with various women of the community, including the mayor's wife, the wife of the Chief of Police, and the judge's wife. However, a brief resume seems desirable.

Chapter 1: Sergeant Thorn and his brother officer, Hal Dempsey, are members of the police force of the town of Dobbsville, population about 40,000 people, and they were on the night shift which began about 11 o'clock each night. The sergeant was in charge of the patrol which covered on call the entire town, while other patrol cars were assigned to specific districts.

Janet Harper and Flora Riley, "two lonely, deprived housewives," whose husbands worked the graveyard shift at a local plant, met them in the dark as they were about to report in at the police station and a rendezvous was arranged for a later hour at a dense thicket, Janet driving a car of her own.

Chapter 2: In due course after the officers cleared at the station and were on their beat the women were met at the designated place; and the chapter depicts vividly the sexual relations between Jim and Janet. Hal went to Janet's car to be with Flora, but as we learn Hal was grievously disappointed because Flora became sick. The two officers leaving the women drove to Gene's Grill where Clara, the ugly waitress, caught Hal's eye, but a police call to respond to a burglary attempt at a local food market interrupted any furher activities along that line.

The chapter depicts the surrounding of the food market and the attempt to catch the burglars who got away, but the Chief of Police had been called and took the spotlight so far as the press was concerned, which disconcerted the officers very much.

Chapter 3: Work at the market having been completed, they were driving down Main Street when they found a pleasantly plump lady of approximately thirty years of age, well-dressed in expensive evening attire, thoroughly intoxicated, with her arms around a lamp post. They proceeded to put her in the car, and after some conversation Hal had sexual intercourse with her in the back seat. From the contents of her pocketbook they discovered she was the wife of a bridge building contractor who lived in a large house on fashionable Nob Hill, so they took her home. There being no one at the house they laid her gently upon the couch and departed.

They had three hours more of work, and as they were driving along a call came that there was a family disturbance at a certain address. Going there, they found the husband thoroughly intoxicated and his wife and seventeen-year old daughter very much frightened because of his violent intentions toward his wife. They prevailed upon him to go to a hotel for the night; and after taking him there they returned to the house, Sergeant Jim having in mind illicit relations. The lady, however, ordered him out of the house; and Jim had a heavy feeling that she would report the matter to the chief in the morning.

Chapter 4: This chapter depicts the interview with the chief the following day, and after getting thoroughly dressed down by the chief, the latter told him that his wife wanted to see him in order to arrange for the police picnic and the various details connected with it, just as they had the year before, and for him to go see the chief's wife within the next day or so.

It had been a tough day for Jim. He went on home where his wife Alice was quite concerned, but, of course, he did not tell her anything. As he relaxed in the living room his thoughts drifted back to a couple of months ago to the time when he had gone to his partner's house to see him, but Hal had gone to a nearby town on business. The latter's wife was home, and the interview resulted in sexual relations between the two of them, Jean telling him that she had to be careful but she would get in touch with him again.

He then later reported to the police station and took up the night's work, going to the K & O Cafe where Molly was the night manager. Molly's husband being out of town, a rendezvous was arranged at Molly's house for 2:30 in the morning, and the night dragged on in Jim's mind until he arrived there. There is then depicted the relations that took place between the two of them, and their various conversations in vivid language.

And on page fifty there is depicted the acts of cunnilingus and fellatio. (State v. Murray, 66 So. 963, 965, 136 L. A. 253.)

He stayed there in peaceful slumber until dawn, and finally got checked in just in time.

Chapter 5: Jim goes to Mrs. Jefferson's home, the wife of the Chief of Police, in order to make arrangements about the details of the picnic coming in a few months. She was appropriately dressed for an affair, and attempted to lure the officer into sexual relations, but it was apparent to Jim that this was either a trap or the lady had imbibed too freely, so he promised to come back the next day; at any rate, Jim was convinced that she was not sober.

Chapter 6: Jim had been giving the episode at the chief's home considerable thought, and had come to the conclusion that it was genuine, so he hurried to Mrs. Jefferson's home in the afternoon. Taking the lady at her word of yesterday he proceeded to make advances to her and was stunned when she was indignant and ordered him out of the house. After considerable pleading, he was able to get her to listen to his explanation, and she apologized to the sergeant and asked forgiveness for getting tipsy and doing what she did.

Chapter 7: Jim and Hal were on another eight-hour shift, and in the course of the evening stopped at the K & O Cafe where Molly was at her usual place. She was happy that she was going on the day shift in the morning and would like to have both of them there early for breakfast, which was very acceptable to the two officers. In due course they arrived at the K & O Cafe where they noticed that Sally, the waitress, was in there a half hour early, so Hal went in with a devious purpose in mind while Jim drove around the block for a half hour until the cafe opened and then came to the restaurant.

The author describes Hal as looking like the cat that got the canary. Sally was standing in the kitchen doorway with a rumpled white uniform and slightly mussed blonde hair. Hal's conversation with Jim indicates that the act was done while Sally sat on the edge of the meat block; as Hal says, "It wasn't too comfortable, but it's the best the K & O offers."

Upon checking out at the station in the morning, Jim decided to meet the new night dispatcher, Norma Jane Dickerson. He went to the radio room where Betty, whom Jim knew, introduced him. Norma had been divorced for sometime. He took Norma to her home. The usual description of illicit love and sexual relations are gone into in great detail, the relations being, in part, other than normal. He stayed for lunch and spent considerable time going home on what to tell Alice.

Chapter 8. After having a rough day with Alice, Jim and his part-

ner were back in old faithful cruising on the night shift. The officers were stopped on a dark street by Janet and Flora who just had to see them to tell them that their husbands were back in town, being transferred to the day shift, and they would let them know as soon as they were back in circulation.

The officers decided to run the roads out in the country to see what they could find. In due course, about five miles out of town, they noticed a slight reflection of light coming from a thicket, and by careful and quiet approach discovered a couple in the back seat of a car engaged in sexual intercourse. They fired their guns into the air, and were dumbfounded when the man that jumped out of the car was their own Chief of Police and the lady was the judge's wife.

With appropriate language the chief ordered them to appear at his office in an hour. Conference in the office resulted on an agreement that mum was the word, as a result of which the chief stated that as long as he was Chief of Police their jobs were secure.

Chapter 9. Another night with Jim at the wheel. Hal said that he had a date with Sally at 12:30 at the drive-in theater, so they proceeded there. Jim told Hal he would be back in an hour to pick him up. A call came that a prowler was at a certain residence, so Jim proceeded to take care of the call. It turned out that the address was the Mayor's house, the Mayor being out of town. She invited Jim in, and in due course, after some drinking, the author describes their act of sexual intercourse, followed by a joint shower. After a couple of hours, Jim drove back to pick up Hal; Sally's Plymouth was nowhere in sight and Hal was sitting disconsolately awaiting the return of his partner.

In due course they drove to Gene's for a cup of coffee, then Jim being under the influence of liquor had Hal drive to a duplex where the night dispatcher, Norma, lived. They decided to tip toe quietly and peek through the openings in the blind, there being a faint light in the apartment. In this process they knocked two galvanized wash tubs from the supporting nails on the side of the house, but not before they discovered that Chief of Police Jefferson was in bed with Norma and engaged in sexual intercourse. They rushed from the neighborhood after being fired upon by a neighbor with a shotgun, and managed to elude identification. Then answering a call from headquarters to investigate a prowler, they made the report that had already been done and no one was discovered. The chief did not come out of the house.

Chapter 10. Alice left a note that she had to go to a neighboring town to do some shopping, which note Jim discovered upon waking up at 3 o'clock in the afternoon. Hal had told Jim before quitting in the morning that he had to go to another town on business, so Jim called Hal's wife, Jean, which resulted in him going to her house; and the author describes a wild scene of sexuality, part of which was in an unnatural way.

The next scene is Jim back in his car beginning another night of patrol. He came upon an intoxicated driver who turned out to be one of the prominent men of the town, so Jim drove him home in his car and was given a $100 bill to keep it quiet.

A call from the dispatcher told him that Hal was at the station

awaiting him, so after picking up his partner they drove to the outskirts of the city where they came upon a clearing in which there was about two dozen boys and girls, naked and engaged in an orgy. Jim called the sheriff, and the young people were arrested by the sheriff. The acts of cunnilingus and fellatio are vividly described by the author as taking place between the young people who were students in a local college. The officers were quite happy that they were the ones that exposed the college virgin club.

Chapter 11. This was a lonely Sunday night when Jim was riding lone ranger again. Last Sunday night had been a delightful one with Molly, but this would be much different because Molly's husband was expected home, and, further, Molly had caused him some worry about telling him that she was maybe pregnant. In due course he got a call to come to the station where the editor of the local newspaper wanted to make him acquainted with Violet Thomas who was new to the paper and would like to go with him on the night shift to get experience and information for the paper.

Jim took her with him to be on the night run. She was interested, for newspaper purposes, in the place where the young people had been caught, so he drove out there, becoming very much impressed with her. The chapter describes her gradually yielding to him, she being a virgin, and their act of sexual relations.

Chapter 12. An accident happened and it became the duty of the officers to investigate the accident, and in connection therewith to go to the hospital where one of the injured persons was. It turned out to be a very minor affair but they got acquainted with two nurses, and it was agreed that they would crawl in the window of the nurses' home at a certain time. They did so, and the chapter describes the illicit relations which took place, or, as the author puts it. ". . . . they plunged into the more serious business of maintaining the reputation and sexual integrity of the Dobbsville police force. Maybe they should have a medal, too?"

Chapter 13. A black sedan flashed by them at high speed as they were on patrol; they were unable to overtake it until so far out into the country they radioed for a road block at a certain point. The deputy sheriff put up the roadblock but the car went around, so Jim and Hal did the same thing, and, finally, as it was being overtaken the fleeing car skidded into a ditch, climbed an embankment and fell back, turning completely over. Three boys and three girls in their late teens crawled out of the car, but fortunately were not injured. The chapter describes the interview between the officers and the juveniles, as a result of which the deputy sheriff took them in to charge them with violation of the law.

Going to Gene's Grill, a call came that a prowler was at a certain address. They went there, parked in front of the house. The lady was surprised to see two of them, as apparently she only wanted one. Jim sat in the cruiser out in front while Hal investigated the property for the prowler, and in due course Hal came up and reported his sexual relations with the woman.

Proceeding on patrol they discovered a car had been following them for quite a while so they stopped it and found a very pretty lady who

needed help, as a result of which the lady followed the patrol car to a clearing on the outskirts of the town. Jim went to her car and in due course returned, reporting to Hal his experience with the woman and the sexual intercourse that had taken place.

Chapter 14. They went to Gene's Grill and were surprised to see Tresa who was the owner of the restaurant and also the madam of the house which was operated in conjunction therewith, coming toward them, smiling. She gave them tickets for a party that she was having at a future date, and after further conversation Tresa arranged with them to stop at her home in an hour. Tresa was very high priced and the officers were thrilled, but she had specified that there would be no charge.

After due course the officers rendezvoued at the lady's home; the author describes the sexual relations in vivid language which took place successively by the two officers and Tresa.

Chapter 15. Jim was working alone this night, quite elated because Molly had given him the good news that she was not pregnant, and, further, that her husband was leaving next week for a two-month stay in Mexico on another job; also a letter from Janet had reported the good news that both her husband and Flora's husband had been transferred to the night shift, so they would be free at night in a short while.

He called Violet at the newspaper office but she was tied up with a night story. The thought suddenly occurred to him that he had been neglecting his own wife Alice for a long time, and she was a very beautiful woman, so he decided to slip home quietly and see Alice.

Gaining entrance to the house very quietly and pushing the bedroom door open slightly, he was surprised to hear the soft ruffle of clean sheets and the faint squeak of the bed springs. He checked himself and heard the conversation between Hal, his brother officer, and his own wife, Alice, who were on the bed engaged in sexual intercourse. He listened to the loving conversation between them in which Alice said, among other things, that Jim didn't suspect the times that she had, instead of being shopping or engaged other ways, met Hal at designated places. All at once Jim was too heavy for his feet, and a wave of sickness struck him and as he leaned against the wall he asked himself, "What in the world have I ever done to deserve this?"

We now come to the difficult question of what is meant by the word "obscenity." In Roth-Alberts v. United States, 354 U.S. 476, 1 L. ed. 2d, 1498, 77 S. C. 1304, decided together June 24, 1957, the Court by divided opinion held that the First Amendment was not intended to protect every utterance; that all ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. (Page 484.)

The Court said on page 485:

"This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 states, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956. This is the same judgment expressed by this Court in Chaplin-

sky v. New Hampshire, 315 U. S. 568, 571, 572, 86 L. ed. 1031, 1035, 62 S. Ct. 766:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. **These include the lewd and obscene . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality . . . .**" (Emphasis added by the court.)

"We hold that obscenity is not within the area of constitutionally protected speech or press."

Laying down the test to be followed, the Court said:

"The early leading standard of obscenity allowed material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. Regina v. Hicklin (1868), L. R. 3, Q. B. 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. The Hicklin test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press. On the other hand, the substituted standard provides safeguards adequate to withstand the charge of constitutional infirmity."

Mr. Chief Justice Warren concurred in the result but was of the opinion that the decision should be limited to the facts before the Court and to the validity of the statutes in question as applied; and that the language used in the Opinion was too broad.

Mr. Justice Harlan concurred in the result in the Alberts case which was based upon a statute of California, but dissented in the Roth case which was based upon a United States statute. He states on page 502 and 503:

"And so, in the final analysis, I concur in the judgment because, upon an independent perusal of the material involved, and in light of the considerations discussed above, I cannot say that its suppression would so interfere with the communication of 'ideas' in any proper sense of that term that it would offend the Due Process Clause. I therefore agree with the Court that appellant's conviction must be affirmed."

And again on page 504:

"But in dealing with obscenity we are faced with the converse situation, for the interests which obscenity statutes purportedly protect are primarily entrusted to the care, not of the Federal Government, but of the States. Congress has no substantive power over sexual morality. Such powers as the Federal Government has in this field are but incidental to its other powers, here the postal power, and are not of the same nature as those possessed by the States, which bear direct responsibility for the protection of the local moral fabric."

Mr. Justice Douglas and Mr. Justice Black dissented upon the ground that:

"Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it . . . ."

"I would give the broad sweep of the First Amendment full support. I have the same confidence in the ability of our people to reject noxious literature as I have in their capacity to sort out the true from the false in theology, economics, politics, or any other field."

We then find the test in the Roth case to be that the matter is obscene if to the average person, applying contemporary standards, the dominant theme of the material taken as a whole appeals to prurient interest. It is to be noted that the test uses the words "average person"; this means the average adult person. Determination of the class of average persons is dependent upon the wording of the statute. If the statute enjoins or punishes sales to adults as well as to minors, the average person must be an adult or the statute is unconstitutional. Butler v. Michigan, 352 U. S. 380, 1 L. Ed. 2d, 412, 77 S. Ct. 524. In that case the statute forbade sale of publications to anyone if they tended to corrupt "youth." The Court held that it was unreasonably restrictive to reduce adult reading material to the level of a child, disapproving of the statute as "burning the house to roast the pig." The "average person rule" establishes a typically susceptible person comparable to the "reasonable man" in tort law. And by "average person" is not meant the abnormal adult of noxious tendencies or the person of defective or subnormal mentality.

The instant case is argued upon the basis that the book taken as a whole is obscene; I am not dealing with a publication such as a magazine having various independent articles, nor is it the claim of the Prosecuting Attorney in this case that the portion of the statute applicable to a part of a publication is pertinent here.

As pointed out by one writer, "The key word is 'prurient,' and the gist of the word is that a person reads the material primarily for the sexual, lustful sensation it affords." 27 Cincinnati Law Review 66. Webster's New International Dictionary defines the word as: "itching, longing, uneasy with desire or longing; of persons, having itching, morbid or lascivious longings."

It is argued by the defendants that the statute does not provide reasonably ascertainable standards of conduct, and therefore violates the constitutional requirements of due process. In the Alberts case the California statute made punishable the keeping for sale or advertising material that is "obscene or indecent," and the argument is that obscene is too indefinite a word. The Court answers that contention in these words, on page 491:

"The Constitution does not require impossible standards; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices . . .' These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning

of the conduct proscribed and mark . . . . boundaries sufficiently distinct for judges and juries fairly to administer the law . . . ."

"In summary, then, we hold that these statutes, applied according to the proper standard for judging obscenity, do not offend constitutional safeguards against convictions based upon protected material, or fail to give men in acting adequate notice of what is prohibited."

I am aware of Commonwealth v. Blumenstein, 396 Pa. 417, 153 A. 2d, 227 (July 2, 1959), wherein the Supreme Court of Pennsylvania held unconstitutional a statute making it a misdemeanor for exhibiting a motion picture "of a lascivious, sacreligious, obscene, indecent, or immoral nature or character, or such as might tend to corrupt morals . . . ." In this case the complaint alleged the act to have been committed in 1956.

The Court held that "sacreligious" was too indefinite; that the test of being "lascivious, indecedent, immoral or impure," and "tending to corrupt morals" were likewise too indefinite, and had been rejected by the United States Supreme Court.

As to the remaining words, "lascivious, obscene, and indecent," the Court held that "lascivious" and "lewd" are held to be synonymous under the cited United States Supreme Court cases, and that "lewd" and "obscene" are given as definitions for "indecent."

Coming to the single term "obscene." the Court reached the conclusion based upon Times Film Corp. v. City of Chicago, 1957, 355 U. S. 35, 78 S. Ct. 115, 2 L. Ed. 2d, 72, that the word "obscene" was too vague to be the basis of a criminal act, and hence the Pennsylvania statute must fall.

Two Justices dissented, holding that under Roth-Alberts the word "obscene" is no longer considered too vague and indefinite. I prefer to follow Roth-Alberts.

See also New American Library of World Literature, Inc. v. Allen (1953, D. C. Ohio), 114 F. Supp. 823.

State v. Nelson, 168 Neb. 394, 95 N. W. 2d 678 (1959), does not require a different conclusion in the case at bar.

It is contended that there being no statutory definition of obscenity in the Ohio Code the Ohio statute must fall. It is clear that the Ohio Legislature enacted substantially the New York statute, and the enactment was in the 1959 session of the Legislature. Under the general rule it would ordinarily follow that the Ohio Legislature intended to give the word the same meaning as was established by the law of New York at the time the New York statute was adopted, which was in 1954, that being prior to the Roth decision in 1957, and the State of New York case law in 1954 defining obscenity being somewhat confusing, it is argued that upon this theory Ohio adopted the statute which was later determined to be vague and uncertain, and hence the Ohio statute must fall for want of a specific definition of the word  That is to ascribe to the Legislature of Ohio a complete ignorance of the meaning of the word in the face of the Roth decision in 1957, which position is unthinkable. What Ohio did was to adopt the injunction method of New York in the light of the law laid down in Roth-Alberts; the defini-

tion of "obscenity" in Roth-Alberts is the foundation upon which Ohio enacted the injunction system of New York. As pointed out by Mr. Justice Harlan in that case the States may adopt such controls as to obscenity as they may deem proper for their own jurisdictions so long as they do not infringe upon the constitutionally protected area. In Roth-Alberts the Supreme Court has indicated to the States within what field they can legislate for the protection of their peoples against lewd and obscene material. I hold that Roth-Alberts is a part of the Ohio statute by clear and inescapable implication.

"Since, in determining the meaning of the terms of a statute, the aim is to discover the connotation which the legislature attached to the words, phrases, and clauses employed, the words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted, and the statute must be construed as it was intended to be understood when it was passed." 50 Am. Jr. p. 224, para. 236, and cases cited in footnotes.

"The 'general rule that adoption of the wording of a statute from another legislative jurisdiction carries with it the previous judicial interpretations of the wording . . . . is a presumption of legislative intention . . . . which varies in strength with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted and the presence or lack of other indicia of intention. Caroline Products Co. v. United States, 323 U. S. 18, 26.'" Yates v. United States, 354 U. S. 298, 309, 1 L. Ed. 1356, 77 S. Ct. 1064.

Here the presence of "other indicia" controls.

Even as to a statute making an act a crime, it is held that the provision of the United States Constitution prohibiting ex post facto laws is not aimed at the decision of the courts in interpreting statutes which were in effect at the time of the commission of the acts. The provision is directed against legislative action only. 11 American Jurisprudence, page 11, 79, Section 350.

Judicially construing a state statute as making criminal certain acts done since its enactment over the objection that such a construction violates the prohibition against ex post facto laws presents no federal question since the prohibition is a restraint upon legislative, not judicial, action. Ross v. Oregon, 227 U. S. 150, 57 L. Ed. 458, 33 S. Ct. 220, Ann. Cs. 1914, C, 224.

It is fundamental that the policy of a State in any field of law may be determined by court decisions in the absence of a statutory limitation. We find no decision of the Supreme Court of Ohio since prior to 1957 dealing with the meaning of the word "obscenity." State v. Mapp, 170 Oh St 427, 166 N. E. 2d 387, assumed that the books and pictures in evidence were obscene and lewd and hence is of no aid to us.

Likewise, State, ex rel. v. Shannon, 170 Oh St 393, 165 N. E. 2d 642, is likewise of no aid.

Going to the lower courts we find Cincinnati v. Walton, decided July 25, 1957, Municipal Court of Cincinnati, 76 Abs 162, 3 O. O. (2d), 252, 145 N. E. 2d 407, dealing precisely with the question. In his opinion, Judge Bettman points out: "There being no Ohio Law binding on this Court, the Court must perforce find its own standard . . . . In fixing its

standard the Court must first be guided by the words of the Supreme Court of the United States in Roth v. United States decided June 24, 1957." (Page 165.)

And then on page 166: "Secondly, in order to satisfy the constitutional requirements of due process of law a proper standard for judging obscenity, said Justice Brennan, must 'give adequate warning of the conduct proscribed and mark boundaries sufficiently distinct for judges and juries fairly to administer the law.' "

The Opinion then analyzes the test of obscenity under Roth and reaches these conclusions:

First, the material must be calculated to appeal to the reader's prurient interest—that is to say, it must be material which from a viewing or reading thereof one arrives clearly at the conclusion that the author or designer had one purpose, namely to sell his material by such an appeal;

Second, the material must have a substantial tendency to excite lustful desire or be material dealing with sexual perversion; it must be not only calculated but effective.

His conclusion was that some of the material was obscene and some was constitutionally protected.

In Cincinnati v. King, decided November 8, 1958, by the Court of Appeals of Hamilton County, 107 Oh Ap 453, 159 N. E. 2d 767, the Court applied the Roth test; quoting, page 455:

"In the Roth case, the court held that obscenity consists of material which deals with sex in a manner appealing to prurient interest. It also defines the test of obscenity to be an inquiry as to whether, to the average person, applying contemporary community standards, the dominant theme of the material, when taken as a whole, appeals to prurient interest. The Roth case also holds that the claim of indefiniteness in obscenity legislation is without merit, for the reason that, applying the proper standards for judging obscenity, adequate warning of the conduct proscribed marks the boundary sufficiently to enable judges and juries to administer the law. Mr. Justice Brennan in his opinion further points out that the federal government has no substantive power over sex or morality; it is the state which bears the responsibility for the 'protection of the local moral fabric.' "

The Court affirmed the judgment of the Court of Common Pleas which had affirmed the judgment of conviction in the Municipal Court. Motion to certify the record was overruled on March 25, 1959. The appeal to the Supreme Court was dismissed for failure to raise the constitutional question in the trial court. In 169 Oh St 107, 157 N. E. 2d 431; this case being a Court of Appeals case is binding upon this Court.

In State v. Kowan, Common Pleas Court of Cuyahoga County, decided October 16, 1958, 82 Abs 123, 7 O. O. 2d 80, Judge Lybarger, adopted and applied the test laid down in Roth.

From the well considered Opinions in these cases, the conclusion is inescapable that the word "obscene" means what Roth-Alberts says it means and stands as the established law of Ohio.

The defendants contend that under the due process clause they have an absolute right to a trial by jury. In Kingsley v. Brown, supra,

the Supreme Court indicated that in this type of action the due process clause does not subject the States to the necessity of having trial by jury in misdemeanor prosecutions, and the Court reasoned from that, at least by inference, that no jury trial was required in this injunctive remedy. In that case, however, the defendants did not attack the statute in the courts below for failure to require a jury and did not bring the issue to the Supreme Court. (Page 444.)

The New York criminal statute makes the distribution of obscene publications only a misdemeanor. The Ohio criminal statute, §2905.34 R. C., however, makes it a felony. **Article I, Section IV, Ohio Constitution,** provides: "The right of trial by jury shall be inviolate. . . ."

This has been construed by the Supreme Court of Ohio to mean that the right of trial by jury obtains only where, under the provisions of the statute claimed to have been violated, a sentence of imprisonment may be imposed as a part of the punishment for such violation. **Stiess v. State, 103 Oh St 33, 132 N. E. 85; Cochran v. State, 105 Oh St 541, 138 N. E. 54.**

A statute of the State provides that if the total penalty in a criminal case is in excess of $50.00, the right to a trial by jury exists in any trial and in any court for the violation of such statute or ordinance. **Sec. 2945.17 R. C.** Also see **15 O. Jur. 2d, pp. 310-312; 32 O. Jur. 2d, pp. 588-592.**

There is no statute in Ohio requiring a trial by jury in an injunction case. While the statements above referred to in the majority opinion may be considered as dicta, it is the duty of the trial judge to follow the established principles of equity jurisprudence, unless and until a higher tribunal lays down a different rule.

Mr. Justice Brennan in a dissenting opinion found that the absence of a right to jury trial in the New York statute was a fatal defect. His reasoning was that the jury represents a cross section of the community and has a special aptitude for reflecting the view of the average person; and that a jury trial was the best method for an appraisal of material according to the average person's application of contemporary community standards.

Following that reasoning, we would then reach the situation where this book would be found to be obscene in many of the 88 counties of Ohio and perhaps not obscene in a fewer number in which there was heavy concentration of population in metropolitan areas. So we then reach the situation where a system of judicial local option within the State is established, resulting in the unequal operation of the law as between dealers selling the same commodity unless the jury verdicts are to be passed upon as to their accuracy as a matter of law by the higher courts. In that case the latter become the judges of the fact as well as the law, so we arrive at the same place from which we started. Of course, as between several States this would not be an anomalous situation, for it must be recognized that each State could permit that which it felt proper; but that would be done by legislative fiat and not by judicial decree. Mr. Justice Harlan in Roth, 505-506. I cannot see how the courts can escape the responsibility of deciding in the final analysis the particular issue in each individual case, bearing in mind that

we are operating within the very delicate and narrow field of what is to be proscribed as against the First and Fourteenth Amendments. Whether we like it or not, the ultimate responsibility must rest upon the judiciary.

Quoting from Mr. Justice Harlan's dissenting opinion in Roth, supra, pages 497, 498:

"* * * The suppression of a particular writing or other tangible form of expression is * * * an individual matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for itself whether the attacked expression is suppressible within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

"I do not think that reviewing courts can escape this responsibility by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as 'obscene,' for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of **constitutional judgment** of the most sensitive and delicate kind." (Emphasis mine.)

In Kingsley International Pictures Corp. v. Regents, 360 U. S. 684, 3 L. Ed. 2d 1512, 79 S. Ct. 1362, decided June 29, 1959, Mr. Justice Frankfurter expresses a similar view:

"We cannot escape such instance by instance, case by case * * * (constitutional adjudication in all the variety of situations that come before this Court)."

And Mr. Justice Harlan in the same case spoke of:

"The necessity for individualized adjudication. In the very nature of things the problems in this area are ones of individual cases * * *."

It should be noted that the Court in One, Inc. v. Olesen, decided January 13, 1958, 355 U. S. 371, 2 L. Ed. 2d 352, 78 S. Ct. 364, and **Sunshine Book Co. v. Summerfield,** decided the same day, 355 U. S. 372, 2 L. Ed. 2d 352, 78 S. Ct. 365, apparently followed this principle in summarily reversing the lower court on the authority of Roth.

We come now to the degree of proof which should be borne in this type case. It is obvious that a mere preponderance of the evidence should not suffice when we are dealing with a constitutional guaranty of freedom of the press as against the police power of the State to restrict. Various words are used through the Federal decisions dealing with this subject matter. This being a case in equity, it seems to me that the tried and true principle of equity is applicable, namely, proof must be at least clear and convincing before the material can be found to be obscene. After a study of many cases in which this subject was discussed, I would go somewhat further and hold that the proof must be clear, convincing and unequivocal, for here we are dealing with a fundamental constitutional right which must be safeguarded beyond any question. Scheiderman v. U. S., 320 U. S. 118, 125, 135, 87 L. Ed. 1796, 63 S. Ct. 1333. That is the test which this court applies.

After a careful review of all of the evidence, including reading the book three times, it is the opinion of the Court, applying the above rule as to degree of proof and under the test laid down in Roth-Alberts, being the law of Ohio, the book is obscene and is outside the pale of constitutional protection.

The words of Mr. Justice Frankfurter, in a concurring opinion in Kingsley Pictures v. Regents, supra, are pertinent here. Quoting from page 692:

"Even the author of 'Lady Chatterley's Lover' did not altogether rule out censorship, nor was his passionate zeal on behalf of society's profound interest in the endeavors of true artists so doctrinaire as to be unmindful of the facts of life regarding the sordid exploitation of man's nature and impulses. He knew there was such a thing as pornography, dirt for dirt's safe, or, to be more accurate, dirt for money's sake."

What D. H. Lawrence, the author, says in "Pornography and Obscenity," pages 12 and 13, as quoted on page 693, applies equally well here:

"The insult to the human body, the insult to a vital human relationship! Ugly and cheap they make the human nudity, ugly and degraded they make the sexual act, trivial and cheap and nasty."

There is no doubt that contemporary literature handles sexual subjects very frankly and very openly as appears by the evidence and by many contemporary works of American Literature. This is as it should be. There is not a sexual subject that has not been touched upon by many writers, not just one. The solution of our problem, however, is whether to the average person, applying contemporary community standards, the **dominant theme** of the material taken together as a whole appeals to prurient interest.

We have analyzed what is meant by an "average person" above; a study of all the evidence gives us the answer to "contemporary community standards." The question then becomes, what is the dominant theme of this book, looked upon as a whole from the front of the front cover to the back of the back cover. I doubt that there is anyone who would claim that this book is a contribution to contemporary American Literature. Just as there is nothing in Lady Chatterley's Lover of "the leer of the sensualist" in the promotion or methods of distribution of the book, the opposite appears here. This is a clear example of an attempt to pander to the adult average person's mind with an appeal designed to cause the person to read the material primarily for the sexual and lustful sensation it affords. It is written and published for the sole purpose of making money; it presumes to operate within the field of freedom of the press, while, in fact and truth, it has no redeeming qualities bringing it within the protection of that freedom.

Defense counsel, on page 115 of their excellent brief, construe Roth-Alberts as indicating these essential ingredients of a test for obscenity under the Constitution:

1. The writing must be without social value;

2. The writing must be judged by its appeal to the average person;

3. The writing must be judged by its dominant appeal, taken as a whole;

4. The appeal of the book must be to aid prurient interest; and

5. The book must be measured by contemporary community standards.

The Roth-Alberts test, as well as the above, are substantially the same as in the American Law Institute Model Penal Code, Section 207.10 (2), Tent. Draft No. 6, 1957, as follows:

"* * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters * * *."

One of the defense witnesses testified that the dominant theme or appeal of the book in question was the classical one of retribution overtaking the wrongdoer. That theme is as old as the hills, and it is obvious that any kind of "dirt" can be portrayed in a book so long as the author in the last paragraph makes a twist that would bring that theme into play. The theme is brought into play merely as a safeguard in an endeavor to protect the book as against the policy power of the State. That is the intent of the author and the intent of the publisher; it may be said that that theme may be a theme of the book, but it is not the dominant theme. The dominant or principle theme is the sale and distribution of the book for profit, using the age old classic as a vehicle to that end.

Further testimony was that the dominant theme was man's inhumanity to himself; also that the defense and protection of citizens is regarded cynically by many officers of the law. I cannot agree. These themes are all secondary; the principle or dominant theme is the portrayal of sexuality in as alluring a light as possible for effective appeal to prurient interest.

It is argued that the book has no theme at all. Assuming that it has, the dominant theme is to be arrived at by a study of it as a whole from the outside of the front cover to the outside of the rear, and so doing it is obscene under the test.

It was stated in argument that the book is a satire upon policemen and police departments. According to Webster's International Dictionary, Second Edition, supra, a satire is:

"A literary composition holding up human or individual vices or folly, or abuses or shortcomings of any kind, to reprobation by means of ridicule, derision, burlesque, or other method of intensifying incongruities, usually with an intent to provoke amendment."

It is also said to be: "The branch of literature ridiculing vice or folly."

If this book be a satire, as claimed, it sadly lacks the redeeming qualities of the above definition; obscenity under the guise of a satire surely does not stand as constitutionally protected.

If the opposite conclusion is reached, then we may as well as to books deprive the States of all police power and adopt the principle that the First Amendment means what it says: namely, that no law shall be passed abridging the freedom of speech or of the press. That is the position taken by Mr. Justice Douglas and Mr. Justice Black in Roth, 514: "Freedom of expression can be suppressed if, and to the

extent that it is so closely brigaded with illegal action as to be an inseparable part of it."

Considerable emphasis was laid during the trial upon the effect of the book, and similar books, upon minors and juvenile delinquency. Any evidence upon that matter is entirely irrelevant and has no place in this case. This case stands or falls upon the effect of the book upon the average adult person. If this statute be construed as applying to minors and juveniles it is unconstitutional under Butler v. Michigan, supra.

There is no statute in Ohio dealing with the sale of obscene literature to minors. If it is desired to enact legislation dealing with that problem, there are statutes available in some of the States; a typical example is 9A, Annotated Laws of Massachusetts, Chapter 272, Section 28, dealing with the sale of obscene literature to a person under 18 years of age, etc. Also see Michigan Penal Code, Sections 142 and 143. See also 27 Cincinnati Law Review 61, cited above, page 74. It is there pointed out that "youth" statutes may be distinguished from general statutes: first, we have always accepted government restrictions upon minors because we assume that the law will protect those who cannot protect themselves; and, second, we would not be "burning the house to roast the pig" when we restrict sales to children of matter manifestly tending to corrupt youth.

As stated by the author of that article:

"In short, different standards should be applied to reading matter, sold to children and adolescents than those which are applied generally. Every State should have a special statute suppressing sales to minors of the publications which are devoted to glamorizing lawlessness and licentiousness."

Section 22-a's provision for the seizure and destruction of the instruments of ascertained wrongdoing expresses resort to a legal remedy sanctioned by the long history of Anglo-American law, as stated in Kingsley v. Brown, page 444. The Court found no constitutional infirmity in the provision of the statute providing for seizure and destruction of the material after judgment.

Final judgment of injunction is entered in favor of the relator, such judgment to contain a provision directing the defendants to surrender to the sheriff of the county all copies of the aforesaid book, and the sheriff is directed to seize and destroy the same.

See Journal Entry to be furnished by counsel.