CITY OF URBANA, EX REL. NEWLIN, DIR. OF LAW, APPELLEE, *v.* DOWNING
ET AL., APPELLANTS.

[Cite as Urbana, ex rel. Newlin, *v.* Downing (1989), 43 Ohio St. 3d 109.]

(No. 88-30—Submitted February 14, 1989—Decided May 24, 1989.)

*Joseph A. Palmer,* for appellee.

*Michael W. Hemm, Shulman & Hall* and *Thomas G. Kramer,* for appellants.

*Paul F. Moke* and *Elinor R. Alger,* urging reversal for *amicus curiae,* American Civil Liberties Union of Ohio Foundation, Inc.

WRIGHT, J. The defendants-appellants raise ten propositions of law, including challenges to the jurisdiction of the Urbana Municipal Court to rule whether the five magazines at issue are obscene. For the reasons that follow we affirm the lower court's rulings.

In their first and third propositions of law, the defendants-appellants challenge the subject-matter jurisdiction of the Urbana Municipal Court to hear this declaratory judgment action. The trial court denied defendants' motion to dismiss based upon the same arguments regarding subject-matter jurisdiction. The defendants then filed their answer and asserted counterclaims which alleged damages of fifteen thousand dollars. The counterclaims were dismissed without prejudice by the defendants before the plaintiff's answer could be filed, pursuant to Civ. R. 41(A)(1) and (C). The plaintiff in this action seeks only declaratory relief.

A municipal court is a court of record which has the power to grant declaratory relief provided it has subject-matter jurisdiction over the underlying action. R.C. 2721.02; *State, ex rel. Foreman,* v. *Bellefontaine Municipal Court* (1967), 12 Ohio St. 2d 26, 28, 41 O.O. 2d 159, 160, 231 N.E. 2d 70, 71; see *Ryan* v. *Tracy* (1983), 6 Ohio St. 3d 363, 367, 6 OBR 416, 419, 453 N.E. 2d 661, 664. R.C. 1901.18 sets forth the subject-matter jurisdiction of the municipal courts. It provides in pertinent part:

"(A) Subject to the monetary jurisdiction of municipal courts as set forth in section 1901.17 of the Revised Code, a municipal court has original jurisdiction within its territory * * *:

"(1) In any civil action, of *whatever nature or remedy,* of which judges of county courts have jurisdiction * * *." (Emphasis added.)

R.C. 1901.17, referred to above, limits the subject-matter jurisdiction to "those cases where the amount claimed by any party, or the appraised value of the personal property sought to be recovered, does not exceed ten thousand dollars. * * *"

Although defendants voluntarily dismissed their counterclaims, they argue that their damages would exceed ten thousand dollars should the plaintiff prevail and prevent the defendants from selling magazines such as those that are challenged in this action. Allegation alone is insufficient to divest a municipal court of jurisdiction based upon the amount of damages at issue unless the allegation is in a formal claim or counterclaim. Accordingly, the Urbana Municipal Court is not deprived of subject-matter jurisdiction upon this basis.

Furthermore, R.C. 1901.20(A) provides that:

"The municipal court has jurisdiction of the violation of any ordinance of any municipal corporation within its territory, * * * [exceptions omitted]. In all such prosecutions and cases, the court shall proceed to a final determination of the prosecution or case."

The action at bar does not fall within any of the exceptions set forth in R.C. 1901.20, nor does it violate any of the other general jurisdictional statutes concerning municipal courts. If the magazines challenged are declared obscene, then the defendants could be subject to prosecution for the

misdemeanor offense of pandering obscenity. U.C.C. Section 133.014 is virtually identical to R.C. 2907.36 in its provision that there will be only one judicial determination whether certain materials or performances are obscene. U.C.C. Section 133.014 provides in part:

"(C) An action for a declaratory judgment pursuant to division (A) of this section shall not be brought during the pendency of any civil action or criminal prosecution, when the character of the particular materials or performances involved is at issue in the pending case, and either of the following apply:

"(1) Either of the parties to the action for a declaratory judgment is a party to the pending case;

"(2) A judgment in the pending case will necessarily constitute res judicata as to the character of the materials or performances involved.

"(D) A civil action or criminal prosecution in which the character of particular materials or performances is at issue, brought during the pendency of the action for a declaratory judgment involving the same issue shall be stayed during the pendency of the action for a declaratory judgment.

"(E) The fact that a violation of sections 133.011 or 133.012 occurs prior to a judicial determination of the character of the material or performance involved in the violation, does not relieve the offender of criminal liability for the violation, even though prosecution may be stayed pending the judicial determination."

For example, if a misdemeanor prosecution for pandering obscenity is initiated first, then that proceeding will determine whether the materials or actions at issue are obscene. That prosecution would take place in municipal court. Subsection (C) precludes a collateral attack in a declaratory judgment action. Likewise, subsection (D) provides that if a declaratory judgment action has been first initiated, then it cannot be collaterally attacked in a simultaneous proceeding. It would make no sense to allow the municipal court to determine whether material is obscene during a misdemeanor prosecution, but preclude such a determination in a declaratory judgment action. For all the above reasons, appellants' propositions of law concerning the alleged lack of subject-matter jurisdiction of the Urbana Municipal Court to hear this action are without merit.

Appellants in their seventh and eighth propositions of law assert that there is no case or controversy here, or if there is, this court should not render a declaratory judgment since it would not terminate the uncertainty or controversy giving rise to the proceeding. Appellants base this argument on the fact that a magazine is sold only for a limited period of time, and it is, in the normal course of business, removed from the market before all judicial proceedings can be terminated.

Such an argument, if accepted, would preclude a court from ever rendering a declaratory judgment as to whether a magazine is obscene. The determination of whether a magazine is obscene must be directed solely to each particular magazine at issue and procedural safeguards must be followed that are "designed to focus searchingly on the question of obscenity." *Marcus* v. *Search Warrant* (1961), 367 U.S. 717, 732. For example, "[w]hile a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause, the publication may not be taken out of circulation completely until there has been a determination of obscenity after an adver-

sary hearing." *Fort Wayne Books, Inc.* v. *Indiana* (1989), 489 U.S. ___, ___, 103 L. Ed. 2d 34, 51-52, 109 S. Ct. 916, 927. In other cases involving important First Amendment rights this court has held that a case or controversy is not moot if the issues involved are "capable of repetition, yet evading review." *State, ex rel. The Repository,* v. *Unger* (1986), 28 Ohio St. 3d 418, 420, 28 OBR 472, 474, 504 N.E. 2d 37, 39; *State, ex rel. Plain Dealer Publishing Co.,* v. *Barnes* (1988), 38 Ohio St. 3d 165, 527 N.E. 2d 807, paragraph one of the syllabus. Such a situation exists here. While this proceeding can only determine whether the specific magazines at issue are obscene, and those magazines have long since been withdrawn from circulation, the rationale and the facts in this decision should provide guidance in other cases. Accordingly, this controversy is not moot and appellants' seventh and eighth propositions of law are without merit.

Appellants assert in their fourth proposition of law that the trial court erroneously admitted the testimony of plaintiff's lay witnesses in violation of Evid. R. 701, which provides:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

The wording of the Ohio rule is identical to Fed. R. Evid. 701. "The primary purpose of Rule 701 is to allow nonexpert witnesses to give opinion testimony when, as a matter of practical necessity, events which they have personally observed cannot otherwise be fully presented to the court or the jury." *Randolph* v. *Collectramatic, Inc.* (C.A. 10, 1979), 590 F. 2d 844, 846.[2] In an obscenity trial, the trier of fact must determine, among other factors, whether the average person applying contemporary community standards would find that the work taken as a whole appeals to the prurient interest. *Miller* v. *California* (1973), 413 U.S. 15, 24. "[T]he term 'average person' does not include any number of people, the majority, or a few, or some, but is a term connoting a composite or synthesis of the community." *United States* v. *Treatman* (C.A. 8, 1975), 524 F. 2d 320, 323. Qualitatively, the term average person does not mean the "abnormal adult of noxious tendencies or the person of defective or subnormal mentality." *State, ex rel. Beil,* v. *Mahoning Valley Distrib. Agency, Inc.* (C.P. 1960), 84 Ohio Law Abs. 427, 440, 169 N.E. 2d 48, 59. For purposes of the *Miller* test, the average person is one with average sex instincts. *Volanski* v. *United States* (C.A. 6, 1957), 246 F. 2d 842, 844.[3]

---

[2] The rule does not alter prior Ohio law. Lay witnesses are routinely allowed to give their opinion on matters such as the speed that an automobile was traveling, the weather conditions observed, or the apparent drunkenness of a person. See, generally, Annotation (1979), 44 A.L.R. Fed. 919.

[3] For this proposition *Volanski* quoted at length from District Judge Woolsey's opinion in *United States* v. *One Book Called*

*"Ulysses"* (S.D.N.Y. 1933), 5 F. Supp. 182, affirmed (C.A. 2, 1934), 72 F. 2d 705. The district court "Ulysses" opinion was cited by the Supreme Court in *Roth* v. *United States* (1957), 354 U.S. 476, 489, fn. 26, as a decision which applied the correct standard which the court then framed as: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Id.* at 489. This standard was incorporated ·as the first of

When the judge is the trier of fact in an obscenity case, the situation here, he must gauge the reaction of the community when and as if the "average person" viewed the material. *United States* v. *One Reel of 35mm Color Motion Picture Film* (C.A. 2, 1974), 491 F. 2d 956, 958. Expert testimony on community standards is not required. See *Pinkus* v. *United States* (1978), 436 U.S. 293, 302.[4]

The United States Supreme Court has stated that if the materials alleged to be obscene are placed into evidence, they "are the best evidence of what they represent" and that expert testimony is not necessary to establish that they are obscene unless the materials are "directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." *Paris Adult Theatre I* v. *Slaton* (1973), 413 U.S. 49, 56, fn. 6 (citing *Mishkin* v. *New York* [1966], 383 U.S. 502, 508-510). If the materials alleged to be obscene are admitted into evidence, there is no need for lay witnesses to testify whether they think those materials are obscene. *Paris Adult Theatre I, supra,* at 56. See *Avery* v. *Maryland* (D. Md. 1980), 515 F. Supp. 818, 824, affirmed without opinion (C.A. 4, 1981), 661 F. 2d 917, certiorari denied (1981), 454 U.S. 1081.

We must review the trial court's decision whether to admit evidence under Evid. R. 701 according to an abuse-of-discretion standard, which has been defined as connoting "more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court." *Steiner* v. *Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E. 2d 855, paragraph two of the syllabus.

In reaching its decision, the trial court considered the testimony of all the witnesses, their interest in the case, their bias or prejudice, and their knowledge on the subject. There is no indication that the trial court simply counted the number of witnesses, or deferred solely to the opinions of the plaintiff's witnesses who did testify, or based its decision on the theory that the community was simply against obscenity. Evid. R. 701 contemplates that the opinion testimony of the lay witness will be helpful. Undoubtedly, the trial judge thought that that was the case. Admission of such testimony was not required, but it was not an abuse of discretion to hear it. *State* v. *Loshin* (1986), 34 Ohio App. 3d 62, 67, 517 N.E. 2d 229, 234. Appellants' fourth proposition of law is overruled.

Appellants' sixth proposition of law is that the appellate court did not make an independent review of the facts. We disagree. Further, we now proceed with our own independent review which addresses the appellants'

---

the three-part test in *Miller* v. *California* (1973), 413 U.S. 15. See *Brockett* v. *Spokane Arcades, Inc.* (1984), 472 U.S. 491, 497.

[4] A jury may well be better equipped for the task of determining contemporary community standards than a judge, since a jury represents a cross section of a community and has a special aptitude for reflecting the view of the average person. There is a close analogy between the function of "contemporary community standards" in obscenity cases and "reasonableness" in other cases. "A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law." *Hamling* v. *United States* (1974), 418 U.S. 87, 104-105. In this case, the defendants waived their right to a jury trial.

remaining arguments. Both the Ohio and the United States Constitutions protect freedom of speech.[5] "All ideas having even the slightest redeeming social importance — unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion — have the full protection of the guaranties [of the First Amendment], unless excludable because they encroach upon the limited area of more important interests." *Roth* v. *United States* (1957), 354 U.S. 476, 484. Justice Brennan, writing for the majority in *Roth,* aptly stated that "[s]ex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Id.* at 487. Communication concerning sex is protected speech under the Ohio and United States Constitutions *unless* that communication meets the legal standard of obscenity. The definition of obscenity is a question of law and a legal term of art. *Hamling* v. *United States* (1974), 418 U.S. 87, 118.

Obscenity is one of the categories of communication "to which the majestic protection of the First Amendment does not extend because they 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Bose Corp.* v. *Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 504 (quoting *Chaplinsky* v. *New Hampshire* [1942], 315 U.S. 568, 572).

However, courts have had great difficulty dealing with the persistent problems of defining obscenity. Justice Brennan, the author of the majority opinion in *Roth,* now maintains that no formulation adequately distinguishes obscene material from that protected by the First Amendment.[6] Several state supreme courts have turned to the unique provisions of their state constitutions to hold that no law can prohibit, punish or censor "obscene" speech "in the interest of a uniform vision on how human sexuality should be

---

[5] Section 11, Article I of the Ohio Constitution provides:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted."

The First Amendment to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[6] See Justice Brennan's dissent in *Paris Adult Theatre I* v. *Slaton* (1973), 413 U.S. 49, 73. In 1970, the President's Commission on Obscenity and Pornography recommended that laws regulating adults' access to sexually explicit materials be repealed. See Justice Stevens' dissent in *Ft. Wayne Books, Inc.* v. *Indiana* (1989), 489 U.S. ___, ___, 103 L. Ed. 2d 34, 56-57, 109 S. Ct. 916, 931-932, fn. 1. The 1986 Attorney General's Commission on Pornography did not agree with this recommendation, but it did state that "we recognize that the bulk of the scholarly commentary is of the opinion that the Supreme Court's resolution of and basic approach to the First Amendment issues is incorrect." 1 Attorney General's Commission on Pornography, Final Report (July 1986) 260-261.

regarded or portrayed." *State* v. *Henry* (1987), 302 Ore. 510, 525, 732 P. 2d 9, 18; *State* v. *Kam* (Hawaii 1988), 748 P. 2d 372. This court does not see any impediment in the Ohio Constitution to regulating communication that meets the legal definition of obscenity. The citizens of Ohio, and in this case, Urbana, through its elected city council, have manifested a strong desire that obscenity be regulated. Our role is to ensure that that regulation meets constitutional muster.

An appellate court must conduct an independent review of the record in a First Amendment case "to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose, supra,* at 505. In an obscenity case what appeals to "prurient interest" and what is "patently offensive" are essentially questions of fact. *Miller, supra,* at 30. However, the jury or the trial court does not have unbridled discretion to determine these factual questions. They are confined to assessing whether materials depicted or described are "patently offensive 'hardcore' sexual conduct." *Id.* at 27. No one is to be prosecuted for depicting or describing mere nudity. *Jenkins* v. *Georgia* (1974), 418 U.S. 153, 161 (reversing the Supreme Court of Georgia's affirmance of a jury's finding that the movie "Carnal Knowledge" was obscene).

The Urbana ordinances dealing with obscenity are nearly identical to the obscenity statutes, R.C. 2907.01 and 2907.31 *et seq.*[7] In *State* v. *Burgun* (1978), 56 Ohio St. 2d 354, 10 O.O. 3d 485, 384 N.E. 2d 255, this court held

that the then current and nearly identically worded statute defining obscenity, R.C. 2907.01(F), must be read *in ·pari materia* with the requirements of *Miller* v. *California, supra,* since the requirements and examples in *Miller* are substantive constitutional law of First and Fourteenth Amendment magnitude. *Hamling, supra,* at 114. In accordance with such a synthesis the definition of obscenity in R.C. 2907.01(F) was held to be neither unconstitutionally overbroad nor void for vagueness. *Burgun, supra; Turoso* v. *Cleveland Municipal Court* (C.A. 6, 1982), 674 F. 2d 486, certiorari denied (1982), 459 U.S. 880. The same incorporation analysis which was followed in *Burgun* and approved in *Turoso* for R.C. 2907.01(F) applies with equal force to the current Urbana ordinance, U.C.C. Section 133.01(E).

The *Turoso* court set forth its analysis of how the *Miller* standard and the Ohio statute would interact. However, since there is some overlap between the provisions of the Urbana ordinance, the Ohio statute and the requirements of *Miller,* this opinion will set forth the analysis in an order different from that in *Turoso,* but will reach the same conclusion. The first step, and the one that is easiest to start with because of its objective nature, is to focus on the conduct requirement set forth in the second of the three guidelines in *Miller,* that is, whether the material or work "depicts or describes, in a patently offensive way, the sexual conduct specifically defined by the applicable state law * * *." *Miller, supra,* at 24.

The *Miller* court went on to give two "plain examples" of what could be defined by state statute as sexual conduct:

"(a) Patently offensive representations or descriptions of ultimate sex-

---

[7] See Appendix.

ual acts, normal or perverted, actual or simulated.

"(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Miller, supra,* at 25.

Those two examples are not exhaustive but indicative of the character of the acts which are subject to regulation. *Ward* v. *Illinois* (1977), 431 U.S. 767, 773; *Janicki* v. *Pizza* (C.A. 6, 1983), 722 F. 2d 1274, 1276 (construing as constitutional the Toledo municipal ordinances which included the *Miller* examples of sexual conduct in addition to other examples of sexual conduct). The community standards determine if the descriptions or depictions of sexual conduct go so far beyond the customary limits of candor that they are patently offensive.

U.C.C. Section 133.01 parallels R.C. 2907.01 and provides the following definitions:

"(A) 'Sexual Conduct' means vaginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal and anal intercourse.

"(B) 'Sexual Contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

"(C) 'Sexual Activity' means sexual conduct or sexual contact, or both."

After ascertaining whether the material, work, or performance concerns the sexual conduct defined by state or local ordinance which in turn is limited to the same sort of, but not necessarily the exact, conduct set forth in the two *Miller* examples, the trier of fact should then address whether the first prong of the *Miller* test is met, that is, whether " 'the average person applying contemporary community standards,' would find that the work, taken as a whole, appeals to the prurient interest." *Miller, supra,* at 24.

A "prurient" interest is not the same as a candid, normal or healthy interest in sex, rather it is a " 'shameful or morbid interest in nudity, sex, or excretion * * * [which] goes substantially beyond customary limits of candor in description or representation of such matters * * *.' " *Roth* v. *United States, supra,* at 487, fn. 20 (quoting the definition of the A.L.I. Model Penal Code, Section 207.10(2) [Tent. Draft No. 6, 1957]). U.C.C. 133.01(E) gives five definitions of when any material or performance is obscene, as follows:

"When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is 'obscene' if any of the following apply:

"(1) Its dominant appeal is prurient interest;

"(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masterbation [*sic*], sexual excitement or nudity in a way that tends to represent human beings as mere objects of sexual appetite;

"(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educa-

tional, sociological, moral or artistic purpose;

"(5) It contains a series of displays or descriptions of sexual activity, masterbation [*sic*], sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily of its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral or artistic purpose."

The U.C.C. ordinance incorporates the first and third tests of *Miller*. It also gives some additional explicit examples of conduct which would constitute the sort of sexual activity that would be in accord with the second example of the second test or prong of *Miller*.

The third prong of the *Miller* test requires the material, work, or performance be such that when "taken as a whole, it lacks serious literary, artistic, political, or scientific value." *Miller, supra,* at 24.

This third prong is not to be determined by a reference to community standards, in this case Champaign County. "The proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole." (Footnote omitted.) *Pope* v. *Illinois* (1987), 481 U.S. 497, 500-501.

A magazine must be looked at as a whole and not as a series of "works" resulting in a "volume." *Penthouse Internatl. Ltd.* v. *McAuliffe* (C.A. 5, 1980), 610 F. 2d 1353, 1367, certiorari

dismissed (1980), 447 U.S. 931. The Supreme Court first used the "taken as a whole" requirement as a substitute for the "isolated excerpt approach" in the 1957 *Roth* decision. *Roth, supra,* at 488-489. The inclusion of serious literary matter in significant proportions may preclude a finding that a magazine is obscene even though the magazine contains items, photographs for example, which standing alone would be found obscene under the *Miller* test. *Penthouse* v. *McAuliffe, supra,* at 1372. However, a quantitative counting of material is not the test. In *Ginzburg* v. *United States* (1966), 383 U.S. 463, the Supreme Court affirmed a conviction wherein the trial court had determined that only four of fifteen articles in a particular magazine were obscene. The Supreme Court did not address the specific articles but based its decision upon the magazine's "characteristics as a whole, including [its] editorial formats, and not upon particular articles contained, digested, or excerpted in [it]." *Id.* at 466, fn. 5. The "taken as a whole" requirement is part of the first and third prongs of the *Miller* test.

A magazine may contain explicit sexual conduct subject to prohibition under the second requirement of *Miller,* and a trier of fact may determine that the average person in that community would find that the magazine as a whole appeals to the prurient interest, and that characteristic is the principal appeal of the material. Nevertheless, the magazine would not be legally obscene if, under the objective third prong of *Miller,* the trier of fact also concluded that a reasonable person could find "serious literary, artistic, political, or scientific value." The only exception is when there is a sham attempt to insulate obscene material with non-obscene material. If the intent is to appeal to prurient in-

terest then the mere insertion of other matter, irrelevant to the predominant theme of the material, will not prevent a determination that the material is obscene. "This would occur, for example, if the most obscene items conceivable were inserted between each of the books of the Bible." *Penthouse* v. *McAuliffe, supra,* at 1368.

The requirements of *Miller* are cumulative and mandatory. They provide the analytical screen through which all challenged material must be filtered. If the Urbana ordinances defining obscenity and sexual conduct are construed in light of the requirements of *Miller,* they are constitutional as are the parallel Ohio statutes. *Burgun; Turoso, supra.*

We now turn to the challenged magazines.

The trial court ruled that Dr. Joe Scott, an assistant professor of sociology, was qualified as an expert in human sexuality, sociology and obscenity. Dr. Scott testified that all five magazines are considered in the magazine publishing trade as "male sophisticate" magazines as opposed to "explicit" magazines. The difference between the two categories is that explicit magazines show actual penetration, *i.e.,* "there is nothing left to the imagination." Dr. Scott testified that industry records show that approximately nine thousand adult male sophisticate magazines are sold each year in Champaign County. Within the "adult male sophisticate" category, there is a range of content, as is demonstrated by the exhibits.

Courts are not bound by the magazine industry's determination of what is "explicit." *Miller, supra,* at 25 states that "[p]atently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or *simulated*" (emphasis added) may be subject to prohibition. The U.C.C. sections do not require that actual penetration be shown in order to find material obscene provided that all the other criteria are met. We hold that ·actual penetration need not be shown in a photograph, for example, before the second test in *Miller* is satisfied. Accordingly, we hold that the industry practice of publishing photographs with a small black dot obscuring the actual contact between sexual organs and various orifices does not preclude a jury from finding representations of ultimate sexual acts or display of genitals to be patently offensive.

All five magazines contain either in the text, photographs, or their advertisements numerous depictions or descriptions of ultimate sexual acts, cunnilingus, fellatio and sodomy.[8] They therefore contain "sexual conduct" as defined by U.C.C. Section 133.01(A) (R.C. 2907.01[A]). Furthermore, the trial court and the court of appeals determined that the average person of Champaign County applying the contemporary standards of that community would find that each magazine as a whole appeals to the prurient interest. We do not disagree with that assessment. Finally, neither the magazines themselves nor

---

[8] Such activity has been held by other courts to be the sort of "hard core" sexual conduct which is subject to regulation under state and local law. *State* v. *Han* (1981), 63 Hawaii 418, 629 P. 2d 1130; *Sedelbauer* v. *State* (Ind. 1981), 428 N.E. 2d 206, certiorari denied (1982), 455 U.S. 1035; *B & A Co.* v. *State* (1975), 24 Md. App. 367, 330 A. 2d 701; *People* v. *Ridens* (1972), 51 Ill. 2d 410, 282 N.E. 2d 691, certiorari granted (1973), 413 U.S. 912, affirmed on rehearing (1974), 59 Ill. 2d 362, 321 N.E. 2d 264, certiorari denied (1975), 421 U.S. 993.

anything else in the record provides any basis to suggest that any reasonable person would find serious literary, artistic, political or scientific value in any of the magazines when taken as a whole. We do not discern any such value.

Accordingly, the judgment of the court of appeals is affirmed and the plaintiff is granted the declaratory relief he requests: the January 1986 editions of "Juggs," "Nugget," "Velvet"; the December 1985 edition of "Oui"; and the March 1986 edition of "Big Boobs" are legally obscene under the Urbana ordinances.[9]

*Judgment affirmed.*

MOYER, C.J., HOLMES and RESNICK, JJ., concur.

DOUGLAS, J., concurs in the judgment and paragraphs two, three, four and five of the syllabus.

SWEENEY and H. BROWN, JJ., dissent.

DOUGLAS, J., concurring in judgment. I concur in the judgment and paragraphs two, three, four and five of the syllabus. I express concern that paragraph one of the syllabus is restrictive to the point that it will make it difficult — if not impossible — for cities to deal, in any meaningful way, with the ever-increasing problem of obscenity.

H. BROWN, J., dissenting. I dissent because I am convinced that sexually oriented expression should be protected under the First and Fourteenth Amendments to the Constitution of the United States and especially under Section 11, Article I of the Ohio Constitution, unless it is established that the material at issue causes harm.

In *Roth* v. *United States* (1957), 354 U.S. 476, 484, the majority stated:

"All ideas having even the slightest redeeming social importance — unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion — have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. * * *" (Footnote omitted.)

Yet even in *Roth,* the court stressed that "sex and obscenity are not synonymous." *Id.* at 487. Thus sexually oriented matter which was not obscene had the full protection of the Constitution. *Roth* struggled to devise a test to distinguish constitutionally protected from unprotected sexual expression. Courts have continued to wrestle with these determinations for three decades, variously modifying the test, substituting new terms for old and even reversing some former declarations. These efforts have created a hopelessly muddled and con-

---

[9] While the application of the *Miller* standards to the Urbana ordinances and Ohio statutes may be somewhat awkward, a defendant does have sufficient knowledge of the legal status of material to avoid prosecution. As then Justice Rehnquist stated in the obscenity case of *Hamling* v. *United States* (1974), 418 U.S. 87, 124

(quoting *United States* v. *Wurzbach* [1930], 280 U.S. 396, 399):

" 'Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so it is familiar to the criminal law to make him take the risk.' "

fused body of law which provides little guidance to courts and fails to give notice to distributors and publishers as to what material may be outside constitutional protection.[10]

One of the problems is that state efforts to ban obscenity have rested upon an unproven premise. The premise is that viewing sexually oriented material contributes to an increase in crime. This has not been established. Indeed, the opposite conclusion was reached in 1970 by the Commission on Obscenity and Pornography, which was established by Congress to study and determine the actual effects of pornography upon persons exposed to it. The commission stated:

"In sum, empirical research designed to clarify the question has found no evidence to date that exposure to explicit sexual materials plays a significant role in the causation of delinquent or criminal behavior among youth or adults. The Commission cannot conclude that exposure to erotic materials is a factor in the causation of sex crime or sex delinquency." (Footnote omitted.) Report of the Commission on Obscenity and Pornography (1970) 27 (hereinafter "Report of the Commission"); see, also, R. Holmes, The Sex Offender and the Criminal Justice System (1983) 118-120.

The commission further noted that: "On the positive side, explicit sexual materials are sought as a source of entertainment and information by substantial numbers of American adults. At times, these materials also appear to serve to increase and facilitate constructive communication about sexual matters within marriage. The most frequent purchaser of explicit sexual materials is a college-educated, married male, in his thirties or forties, who is of above average socio-economic status. Even where materials are legally available to them, young adults and older adolescents do not constitute an important portion of the purchasers of such materials." Report of the Commission at 53. Other possible positive effects of pornography are that it may have therapeutic and educational value and that it may, for certain individuals, have a cathartic effect. Downs, The Attorney General's Commission and the New Politics of Pornography, 1987 American Bar Found. Research J. 641, 671-674.

Another difficulty in the obscenity case law lies with the application of terms such as "prurient interest," "patently offensive," "contemporary community standards," "serious literary, artistic, political, or scientific value," and the ultimate in colorful nonsense, "I know it when I see it."[11] How can what lies inexpressibly buried within the subjective eye of one supreme court justice guide any court or legislature where a determination of First Amendment limits must be made?

---

[10] Justice Brennan has reached a similar conclusion. He stated that "the concept of 'obscenity' cannot be defined with sufficient specificity and clarity to provide fair notice to persons who create and distribute sexually oriented materials, to prevent substantial erosion of protected speech as a by-product of the attempt to suppress unprotected speech, and to avoid very costly institutional harms." *Paris Adult Theatre I* v. *Slaton* (1973), 413 U.S. 49, 103 (Brennan, J., dissenting). He observed that the members of the court had been unable to reach a consensus concerning obscenity and had been reduced to performing a case-by-case analysis. *Id.* at 84-85.

[11] *Jacobellis* v. *Ohio* (1964), 378 U.S. 184, 197 (Stewart, J., concurring).

In the present case, the majority has fastened its analysis to another of these meaningless phrases. "For purposes of the *Miller* test," the majority says, "the average person is one with average sex instincts." How, one wonders, does the majority, or any judge, identify this mythical person of "average sex instincts"? If the majority really means "average," what is the universe of instincts to be averaged and what is the process by which that can be accomplished? To look critically at the language used in this and other obscenity cases is to see absurdity.

What appeals to one person may offend another. Each individual's experiences and values will shape his opinion of what has merit, is patently offensive or is simply worthless but not obscene. This inherent subjectivity makes uniform analysis and application of the obscenity standard impossible. The commission recognized the subjective nature of the inquiry when it described responses to sexually oriented materials and whether the material was likely to be labeled obscene or pornographic:

"Extremely varied responses to erotic stimuli occur in the judgmental realm, as, for example, in the labeling of material as obscene or pornographic. Characteristics of both the viewer and the stimulus influence the response: For any given stimulus, some persons are more likely to judge it 'obscene' than are others; and for persons of a given psychological or social type, some erotic themes are more likely to be judged 'obscene' than are others. In general, persons who are older, less educated, religiously active, less experienced with erotic materials, or feel sexually guilty are most likely to judge a given erotic stimulus 'obscene.' There is some indication that stimuli may have to evoke both positive responses (interesting or stimulating), and negative responses (offensive or unpleasant) before they are judged obscene or pornographic." Report of the Commission at 26.

The commission noted also that individuals who want the most restriction on the availability of sexually oriented material tend to believe that others in the community agree, *whether or not this is true. Id.* at 33. Thus, the finding that certain material is obscene, based upon the testimony of a handful of community residents who testified that, in their opinion, the material is obscene and that others in the community hold this view, is without a solid base.

A further problem is presented by the Urbana ordinance and other similar attempts to codify a definition of obscenity. Sexual conduct, under the Urbana ordinance, is broadly defined to include ordinary intercourse and even "touching of an erogenous zone of another." If such material arouses lust or appeals to the prurient interest, it may be banned. The problem is this. Sexual depiction which arouses lust is *not* necessarily obscene — even if obscenity is measured by an aesthetic or a dictionary definition. A statute does violence to the right of free expression under the Ohio Constitution and under the First Amendment when that statute is so murky that it operates to indiscriminately ban sexual depiction which arouses lust.

It is time to re-examine the application of the First Amendment and Section 11, Article I of the Ohio Constitution to obscenity cases. The harm caused by the expression under consideration should be the focus. Such a focus fits into a long-standing approach to First Amendment problems. One enjoys free speech, yes, but one

may not shout "fire" in a crowded theater (unless, of course, there is a fire).[12]

There are types of sexually explicit material which cause harm. Two examples are publications which utilize minors and publications which require the commission of a crime in order to produce them.[13]

Unlike the unproven effect of viewing pornography on the crime rate, there is evidence that the use of children in pornographic films and magazines injures their physical and psychological well-being. It has been determined that sexually exploited children are unable to develop healthy relationships in later life and that such children also tend to become sexual abusers as adults. *New York* v. *Ferber* (1982), 458 U.S. 747, 757-764. Thus, the state has a legitimate compelling interest in protecting children from sexual exploitation. The state may prevent the distribution and possession of child pornography as well as its production, because it is extremely difficult to stop child pornography at the production stage. *Ferber* at 759-761; cf. *State* v. *Young* (1988), 37 Ohio St. 3d 249, 525 N.E. 2d 1363; *State* v. *Meadows* (1986), 28 Ohio St. 3d 43, 28 OBR 146, 503 N.E. 2d 697.

Another potential exception to the First Amendment is extremely violent sexually oriented material. Studies performed since 1970 indicate that material which combines sexually explicit depictions with extreme violence is correlated with aggressive attitudes and aggressive behavior against women, in a laboratory setting. Downs, *supra,* at 658, 677-679, and studies cited therein. Thus, the state could, based upon sufficient evidence, regulate sexually oriented material which contains graphic violence.[14]

Restricting the audience for certain kinds of material may also be defensible. It is not my purpose to catalog the types of "harm" that would take a publication out from under constitutional protection. Moreover, those determinations should first be made by the legislature. Such determinations may change and evolve in relation to the study and knowledge of the relationship between suspect material and harm. My point is that the law should be looking for the existence of "harm," not trying to define "obscenity."

If viewing sexually oriented materials does not cause criminal behavior or harm and if criminal behavior is not required to produce the material, what is left? The residue are materials which offend some people — people who can choose to avoid them.

In the case before us, no pernicious effect has been established with regard to the material. What has been shown is that the material is tasteless, designed to stimulate prurient interest, and, in a dictionary sense, is obscene. It is, in short, garbage. But, as Justice William O. Douglas has observed:

"* * * The First Amendment was designed to 'invite dispute,' to induce 'a condition of unrest,' to 'create dissatisfaction with conditions as they

---

[12] *Schenck* v. *United States* (1919), 249 U.S. 47, 52.

[13] The most blatant example is the so-called "snuff" movie in which one or more of the actors are actually killed.

[14] Conceivably, a carefully crafted regulation could also encompass so-called "slasher films" (which frequently are "R" rated) so long as they contain the elements of patent violence and sexual explicitness, in addition to extremely violent hard core pornography. See Downs, *supra,* at 677; see, also, footnote 168 for a suggested definition of this exception.

are,' and even to stir 'people to anger.' *Terminiello* v. *Chicago* [1949], 337 U.S. 1, 4. The idea that the First Amendment permits punishment for ideas that are 'offensive' to the particular judge or jury sitting in judgment is astounding. No greater leveler of speech or literature has ever been designed. To give the power to the censor, as we do today, is to make a sharp and radical break with the traditions of a free society. *The First Amendment was not fashioned as a vehicle for dispensing tranquilizers to the people.* Its prime function was to keep debate open to 'offensive' as well as to 'staid' people. The tendency throughout history has been to subdue the individual and to exalt the power of government. The use of the standard 'offensive' gives authority to government that cuts the very vitals out of the First Amendment. As is intimated by the Court's opinion, the materials before us may be garbage. *But so is much of what is said in political campaigns, in the daily press, on TV, or over the radio.* By reason of the First Amendment — and solely because of it — speakers and publishers have not been threatened or subdued because their thoughts and ideas may be 'offensive' to some." (Emphasis added; footnote omitted.) *Miller* v. *California* (1973), 413 U.S. 15, 44-45 (Douglas, J., dissenting).

The rights afforded by the Ohio Constitution are more specific and plainly authorize the expression of *any* sentiment on *any* subject so long as the expression does not cause harm. Section 11, Article I of the Ohio Constitution of 1851 provides in part:

"Every citizen may freely speak, write, and *publish his sentiments on all subjects,* being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"[15] (Emphasis added.)

I am disappointed that this court, which has almost without exception championed the press in First Amendment cases involving defamation and in cases involving access to public records, fails to recognize that constitutional rights are not solely for the protection of the popular and the influential. Accordingly, I dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.

Appendix

The Urbana ordinances are, with a few exceptions, nearly identical to Ohio statutes: The definitions set forth in U.C.C. Section 133.01 parallel those in R.C. 2907.01, except that the definitions of "prostitute," "spouse" and "minor" are not found. U.C.C. Section 133.01 provides (Revised Code language is in brackets):

"As used in sections 133.011 [2907.01] through 133.015 [2907.37] of the Code of Ordinances of the City of Urbana [Revised Code]:

"(A) 'Sexual Conduct' means vaginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal and [or] anal intercourse.

"(B) 'Sexual Contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a

---

[15] The majority dismisses the Ohio Constitution with the observation, "This court does not see any impediment in the Ohio Constitution to regulating communication that meets the legal definition of obscenity."

breast, for the purpose of sexually arousing or gratifying either person.

"(C) 'Sexual Activity' means sexual conduct or sexual contact, or both.

"[(D) 'Prostitute' means * * *.]

"(D) [(E)] Any material or performance is 'harmful to juveniles,' if it is offensive to prevailing standards in the adult community with respect to what is suitable for juveniles, and if any of the following apply:

"(1) It tends to appeal to the prurient interest of juveniles;

"(2) It contains a display, description, or representation of sexual activity, masterbation [masturbation], sexual excitement, or nudity;

"(3) It contains a display, description, or representation of bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) It contains a display, description, or representation of human bodily functions of elimination;

"(5) It makes repeated use of foul language;

"(6) It contains a display, description, or representation in lurid detail of the violent physical torture, dismemberment, destruction, or death of a human being.[;]

"(7) It contains a display, description, or representation of criminal activity that tends to glorify or glamorize the activity, and that, with respect to juveniles, has a dominant tendency to corrupt.

"(E) [(F)] When considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is 'obscene' if any of the following apply:

"(1) Its dominant appeal is [to] prurient interest;

"(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masterbation [masturbation], sexual excitement[,] or nudity in a way that tends to represent human beings as mere objects of sexual appetite;

"(3) Its dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality;

"(4) Its dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral[,] or artistic purpose;

"(5) It contains a series of displays or descriptions of sexual activity, masterbation [masturbation], sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily of its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral or artistic purpose.

"(F) [(G)] 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

"(G) [(H)] 'Nudity' means the showing, representation, or depiction of human male or female genitals, pubic area, or buttocks with less than a full, opaque covering, or of a female breast with less than a full, opaque covering of any portion thereof below the top of the nipple, or of covered male genitals in a discernibly turgid state.

"(H) [(I)] 'Juvenile' means an unmarried person under the age of eighteen.

"(I) [(J)] 'Material' means any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record or tape, or other tangible thing capable of arousing interest through sight, sound, or touch.

"(J) [(K)] 'Performance' means any motion picture, preview, trailer, play, show, skit, dance, or other exhibition performed before an audience.

"[(L) 'Spouse' means * * *.]

"[(M) 'Minor' means * * *.]"

U.C.C. Section 133.011 [R.C. 2907.31] is omitted because it is not relevant to this decision. U.C.C. Section 133.012, pandering obscenity, parallels R.C. 2907.32 and provides:

"(A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:

"(1) Create, reproduce, or publish any obscene material, when the offender knows that such material is to be used for commercial exploitation or will be publicly disseminated or displayed, or when he is reckless in that regard;

"(2) Exhibit or advertise for sale or dissemination, or sell or publicly disseminate or display any obscene material;

"[(2) Promote or advertise for sale, delivery, or dissemination; sell, deliver, publicly disseminate, publicly display, exhibit, present, rent, or provide; or offer or agree to sell, deliver, publicly disseminate, publicly display, exhibit, present, rent, or provide, any obscene material;]

"(3) Create, direct, or produce an obscene performance, when the offender knows that it is to be used for commercial exploitation or will be publicly presented, or when he is reckless in that regard;

"(4) Advertise [or promote] an obscene performance for presentation, or present or participate in presenting an obscene performance[,] when such performance is presented publicly, or when admission is charged;

"(5) [Buy, procure,] Possess[,] or control any obscene material with the purpose to violate division (A)(2) or (4) of this section.

"(B) It is an affirmative defense to a charge under this section, that the material or performance involved was disseminated or presented for a bona fide medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, clergyman, prosecutor, judge, or other person having a proper interest in such material or performance.

"(C) Whoever violates this section is guilty of pandering obscenity, a misdemeanor of the first degree. Persons convicted under this section may not be prosecuted for a second violation under this section. Also persons previously convicted of a violation of Section 133.011 may not be prosecuted under this section.

"[(C) Whoever violates this section is guilty of pandering obscenity, a misdemeanor of the first degree. If the offender previously has been convicted of a violation of this section or of section 2907.31 of the Revised Code, then pandering obscenity is a felony of the fourth degree.]"

U.C.C. Section 133.013, presumptions; notice; defense, parallels R.C. 2907.35. It provides:

"(A) An owner or manager, or his agent or employee, of a bookstore, newsstand, theater, or other commercial establishment engaged in selling materials or exhibiting performances, who, in the course of business:

"(1) Possesses five or more identical or substantially similar obscene articles, having knowledge of their character, is presumed to possess them

in violation of division (A)(5) of section 133.012 [2907.32 of the Revised Code];

"(2) Does any of the acts prohibited by sections 133.011 or 133.012 [2907.31 or 2907.32 of the Revised Code,] is presumed to have knowledge of the character of the material or performance involved, if he has actual notice of the nature of such material or performance, whether or not he has precise knowledge of its content[s.];

"(B) Without limitation on the manner in which such notice may be given, actual notice of the character of material or [a] performance may be given in writing by the chief legal office of the City [chief legal officer of the jurisdiction in which the person to whom the notice is directed does business]. Such notice, regardless of the manner in which it is given, shall identify the sender, identify the material of [or] performance involved, state whether it is obscene or harmful to juveniles, and bear the date of such notice.

"[(C) Sections 2907.31 and 2907.32 of the Revised Code do not apply to a motion picture operator or projectionist acting within the scope of his employment as an employee of the owner or manager of a theater or other place for the showing of motion pictures to the general public, and having no managerial responsibility or financial interest in his place of employment, other than wages.]"

U.C.C. Section 133.014, declaratory judgment, parallels R.C. 2907.36. It provides:

"(A) Without limitation on the persons otherwise entitled to bring an action for declaratory judgment pursuant to sections 2721.01 to 2721.15 of the Ohio Revised Code, involving the same issue, the following persons have standing to bring such an action to determine whether particular materials or performances are obscene or harmful to juveniles:

"(1) The chief legal officer of the City if [jurisdiction in which] there is reasonable cause to believe that sections 133.011 or 133.012 [section 2907.31 or 2907.32 of the Revised Code] are being violated or are about to be violated [is being or is about to be violated;].

"(2) Any person, who pursuant to division (B) of section 133.013 [2907.35 of the Revised Code], has received notice in writing from a chief legal officer of the City stating that particular materials or performances are obscene or harmful to juveniles.

"(B) Any party to an action for a declaratory judgment pursuant to division (A) of this section is entitled, upon his request, to trial on the merits within five days after joinder of the issues, and the court shall render judgment within five days after trial is concluded.

"(C) An action for a declaratory judgment pursuant to division (A) of this section shall not be brought during the pendency of any civil action or criminal prosecution, when the character of the particular materials or performances involved is at issue in the pending case, and either of the following apply:

"(1) Either of the parties to the action for a declaratory judgment is a party to the pending case;

"(2) A judgment in the pending case will necessarily constitute res judicata as to the character of the materials or performances involved.

"(D) A civil action or criminal prosecution in which the character of particular materials or performances is at issue, brought during the pendency of the action for a declaratory judgment involving the same issue[,] shall be stayed during the pendency of the action for a declaratory judgment.

"(E) The fact that a violation of sections [section] 133.011 or 133.012 [2907.31 or 2907.32 of the Revised

Code] occurs prior to a judicial determination of the character of the material or performance involved in the violation, does not relieve the offender of criminal liability for the violation, even though prosecution may be stayed pending the judicial determination."