OPINION
{¶ 1} The defendant-appellant, Shawn Jenkins, appeals from his conviction for one count of pandering obscenity in violation of R.C.2907.32(A)(2), a felony of the fifth degree. Jenkins, the owner of Tip Top Video, a retail store located in the Cincinnati neighborhood of Clifton, was charged with the offense after he had sold several sexually explicit videotapes, including the videotape upon which he was indicted and convicted, Max Hardcore Extreme Volume Number Seven, to plainclothes detectives of the Hamilton County sheriff's department. After being found guilty by a jury, Jenkins was sentenced by the trial court to a two-year period of community control.
 {¶ 2} On appeal, Jenkins challenges the constitutionality of Ohio's obscenity laws following the United States Supreme Court's decision inLawrence v. Texas (2003), ___ U.S. ___, 123 S.Ct. 2472. In Lawrence, the Court struck down Texas's same-sex anti-sodomy law as a violation of an individual's substantive-due-process rights. Jenkins also asserts that the trial court erred in excluding from evidence two other videotapes that the detectives bought from the store, and that were presented to the grand jury but did not result in an indictment. According to Jenkins, these videotapes, Big Blacks Little Blonds and Rogue Adventures No. 6,
contained graphic sexual material of the same nature as Max HardcoreExtreme Volume Number Seven, and therefore should have been admitted as comparables to aid the jury in determining community standards. Additionally, Jenkins asserts that the prosecution engaged in misconduct in its opening and closing statements; that the trial court erred in instructing the jury; and that his conviction was based upon insufficient evidence.[1]
 {¶ 3} For the following reasons, we affirm.
 FACTS {¶ 4} The essential facts of this case are those describing MaxHardcore Extreme Volume Number Seven. The videotape features Max (whose last name is Steiner, according to the arresting detective) and the actress Karla Lynn. Despite appearing in much of the videotape wearing pigtails and white anklets, Lynn appears to be well over the age of consent. Max appears on the back of the videotape's carton dressed to resemble Crocodile Dundee with a video camera. He is a gentleman of indeterminate age and bland appearance, whose heavy-handed on-screen sexual persona appears to require that he always wear a cowboy hat and usually some form of white polo shirt, cargo shorts, white socks, and hiking boots.
 {¶ 5} The front of the carton does its best to convey the videotape's content. Max is shown in his hat, polo shirt, cargo shorts, socks, and boots, standing behind Lynn and grabbing her by a pigtail so that he can apparently enter her from behind. Lynn wears an expression of obviously feigned outrage. The front blurb reads (and here the reader must be prepared for rather graphic language), "Max is A Magician! Watch As He Transforms These Once-Innocent Girls Into Ass-Reamed, Cum Slobbering Fuck-Toys! It's incredible, The Vile Shit He Gets Them To Do! All Filmed Just For You!"
 {¶ 6} The back of the carton features several stills from the videotape. These stills include close-up shots of Lynn's and another actress's genitalia, as well as shots of Lynn and the other actress engaging in both oral and anal intercourse with Max. The text interspersed among the stills describes three separate vignettes. In the first, Lynn plays a "new troupe leader" who "stops over and is selling cookies so her girls can go to camp." Max "shows her a better sales technique as he quickly rams his cock down her throat and up her ass! Max gives her some milk up her ass-pipe that she sucks outs with a straw."
 {¶ 7} In the second vignette, a character named Dalny is described as a woman who wants to be a "legitimate actress" and who is fooled by Max into believing "he's got a new movie deal." "Max doesn't really like her, so he takes it out by nearly ripping her ass open in some of the most brutal shit he's ever done! Then he cums [sic] in her stretched-open ass and makes her suck it out!"
 {¶ 8} Finally, in the third vignette, Chante is described as someone who has discovered that Max has "put her in a movie" and is now coming back to his apartment "to get even." "But Max turns the tables on her and turns her into his private fuck-hole as he rips her cunt open and reams her ass."[2]
 {¶ 9} Among the stills are pictures of either Lynn or the other actress with some sort of plastic device attached to her anal orifice with an elongated plastic tube extruding from the anal cavity and leading to the actress's mouth.
 {¶ 10} The carton also contains the following notice to the customer: "The video you are about to watch presents fictional accounts of sexual relationships. It was designed to stimulate and enhance your sexual enjoyment as well as to inform and educate. This video presents the idea that sex is an important aspect of adult relationships, and that sexual conduct is enjoyable in various forms of expression. Moreover, this video is meant to serve as a pictorial record of the methods and expressions of sexual conduct. Please note, however, that this fictional sexual relationship does not always exhibit safe sex nor the full range of a real life interpersonal relationship." The carton also notes that the sale of the videotape to minors is prohibited and that the videotape is "non-violent adult entertainment." Finally, the carton indicates that the videotape is rated "XXX."
 {¶ 11} The videotape itself is largely as described. Significantly, however, despite the carton's language of brutality, the sexual scenes are devoid of any overt physical violence. The female characters are never struck or physically threatened. Max's attitude is best described as harsh and domineering, but the conceit of the action, obviously designed for a male audience, is that the female is ultimately willing if not eager to submit to his sexual dominance and ultimately to derive pleasure from it, exhorting him verbally as he engages her sexually. That is not to say that the female characters are not treated as objects, and sometimes roughly and in demeaning fashion, but it would be specious to suggest that the action is depicted as nonconsensual or as a form of anal or vaginal rape. (Although the state's brief describes the videotape as showing the "infliction of pain on the participants" and the women being "forced to drink the fluids * * * through a straw," we do not find this characterization accurate.)
 {¶ 12} The production values are amateurish and crude. The only set appears to be the apartment or house of someone involved in the production. The images are, at times, emotionally jarring. Anal penetration, both with Max's phallus and other objects, is shown close up and often. Bodily orifices, sometimes stretched open with a plastic device (which the prosecution has identified as a speculum), are depicted at such close range that they fill the screen, giving the viewer an unsettling perspective. At times, the camera is pointed down into the orifice. There are several scenes where the female character's face and other parts of the body are ejaculated upon. In other scenes the actress licks Max's anus.
 {¶ 13} Perhaps the most disconcerting imagery in the videotape is that alluded to on the back of the carton. The imagery depicts Max using a speculum to stretch open the female actress's anal cavity, ejaculating into it, pouring in milk, and then inserting a length of plastic tubing. The female actress then begins sucking on the other end of the tubing and gargling the fluid out of her mouth, all the while seeming to derive gratification from the endeavor.
 ANALYSIS 1. Substantive Due Process
 {¶ 14} As noted, Brown challenges the constitutionality of Ohio's obscenity laws following the decision of the United States Supreme Court in Lawrence, supra, which struck down a Texas statute making it a crime for two persons of the same sex to engage in intimate sexual conduct. The Court determined that the statute violated the Due Process Clause of the Fourteenth Amendment because it sought to control "a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." Id. at ___, 123 S.Ct. at 2478. Although the Court did not go so far as to announce a fundamental right to engage in consensual sodomy, the Court did find a substantive-due-process right for homosexuals to "enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons," a right that encompasses sexual behavior, including sodomy, as "one element in a personal bond that is more enduring." Id.
 {¶ 15} As the above quotations make clear, Lawrence was foremost concerned with state efforts to punish intimate sexual behavior — what the Court described as "the most private human conduct, sexual behavior, and in the most private of places, the home." Id. Jenkins, however, argues that Lawrence should be read as the culmination of a trend in which "[t]he liberties guaranteed by substantive due process have moved out of the marital bedroom and into the public sphere of commercial interactions and private interactions between consenting adults." In this regard, Jenkins points to the dissent of Justice Scalia in Lawrence, in which the Justice decried the majority's holding as tantamount to a conclusion that the state can no longer assert a legitimate interest in passing any law, including those proscribing prostitution, incest, adultery, child pornography, and obscenity, that promotes "a majoritarian sexual morality." Id. at ___ U.S. ___, 123 S.Ct. at 2495. Indeed, Justice Scalia saw in Lawrence "the end of all morals legislation." Id.
 {¶ 16} Addressing Justice Scalia's dissent, we note first that his conclusion that Lawrence signaled the end of all morals legislation was the product of his own analysis of the majority's decision, in which he rejected the substantive-due-process argument and stated that what the majority had actually done was to strike down the Texas statute because it viewed the statute as lacking any rational basis. Reading the majority opinion in such an idiosyncratic manner, Justice Scalia posited that the majority had thereby eliminated the fostering of a majoritarian morality as a legitimate state interest in any future rational-basis review. Id. Justice Scalia was entitled to his opinion, but we do not share his view that Lawrence was intended to have such dire consequences for a moral majority.
 {¶ 17} Nor do we accept Jenkins's attempt to use Justice Scalia's remarks to turn Lawrence into something that it was not: the announcement of a substantive-due-process right to sell obscene materials. Indeed, the basis of the majority's opinion in Lawrence was an "emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters relating to sex." Id. at ___, 123 S.Ct. at 2480. The Court observed a trend among the states that had criminalized homosexual conduct either to abolish such laws or, in the case of states that continued to maintain such laws, to engage in a pattern of "nonenforcement with respect to consenting adults acting in private." Id. at ___, 123 S.Ct. at 2481. The majority also looked to the values shared by a "wider civilization" and noted that the European Court of Human Rights had recognized the right of homosexual adults to engage in intimate, consensual conduct. Id. at ___, 123 S.Ct. at 2483.
 {¶ 18} We do not believe that any of this logic transposes to the commercial enterprise of selling obscene materials to the public. We do not perceive any "emerging awareness" opposing obscenity laws or a pattern of nonenforcement that would suggest that the right to sell materials deemed obscene has become part of the concept of ordered liberty. By definition, obscenity violates community standards. In our view, the holding of Lawrence was concerned solely with the state's attempt to enter into the relationships of its citizens and to regulate the intimacies of physical relationships and "private sexual conduct," none of which is applicable to the selling and renting of obscene videotapes in a public business establishment. Id. at ___,123 S.Ct. at 2482-2484.
 {¶ 19} Rather than signaling the end of all morals legislation, in our view the majority in Lawrence simply confirmed that the Due Process Clause protects certain personal decisions relating to sexual practices either in the bedroom or in other private places. As one commentator onLawrence has stated, "[T]he broad libertarian reading of Lawrence is not the best understanding of the decision. Lawrence is many things, some of them quite remarkable * * * [but the] the broad libertarian reading ofLawrence is an over-reading of the decision, and implausible doctrinally, historically, and normatively." Carpenter, Gay Rights After Lawrence v. Texas: Is Lawrence Libertarian? (2004), 88 Minn.L.Rev. 1140. We note, in this regard, that courts have already rejected Lawrence as a basis to challenge laws involving the viewing of child pornography in the home, see United States v. Peterson (D.S.C. 2003), 294 F.Supp. 797,803, the definition of "family" for zoning purposes, see Westhab, Inc.v. City of New Rochelle (May 3, 2004), S.D.N.Y No. 03 Civ. 8377; and same-sex marriage. In re Kandu (Bankr.Ct.Wash. 2004), 315 B.R. 123, 140.
 {¶ 20} Because we do not accept that Lawrence has the sweeping import that Jenkins suggests, we reject the central premise of Jenkins's due-process argument: that the "constitutionality of [Ohio's obscenity laws] must be revisited in light of Lawrence." As Jenkins acknowledges, even though the Supreme Court has recognized a person's right to sit alone in the privacy of his own home and view obscene matter, see Stanleyv. Georgia (1969), 394 U.S. 557, 89 S.Ct. 1243, the Court has never articulated a correlative right to transport, distribute, mail, or sell such materials.
 {¶ 21} To the contrary, the Court has often articulated the view that "[t]he States have a long-recognized legitimate interest in regulating the use of obscene material in local commerce and in all places of public accommodation, as long as these regulations do not run afoul of specific constitutional prohibitions." Paris Adult Theatre I v. Slayton (1973),413 U.S. 49, 57, 93 S.Ct. 2628; see, also, United States v. Thirty-SevenPhotographs (1971), 402 U.S. 363, 376-377, 91 S.Ct. 1400. "In an unbroken series of cases extending over a long stretch of this Court's history it has been accepted as a postulate that `the primary requirements of decency may be enforced against obscene publications.'" Kingsley Books,Inc. v. Brown (1957), 354 U.S. 436, 440, 77 S.Ct. 1325, quoting Near v.Minnesota ex rel. Olson (1931), 283 U.S. 697, 716, 51 S.Ct. 625. Indeed, the Court has recognized the state interest in "stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to passersby."Paris Adult Theatre I, supra, at 57-58, 93 S.Ct. 2628. Included in the state's interest is "the interest of the public in the quality of life and the total community environment * * *." Id.
 {¶ 22} For all these reasons, we decline Jenkins's invitation to declare Ohio's obscenity laws unconstitutional in light of Lawrence.
 2. Excluded Videotapes
 {¶ 23} Jenkins further argues that the trial court committed error when it denied him the ability to present to the jury certain videotapes that he considered comparable to Max Hardcore Extreme Volume NumberSeven. The titles he attempted to have admitted were Big Blacks LittleBlonds and Rogue Adventures No. 6. These tapes were presented to the same grand jury that returned an indictment against Max Hardcore ExtremeVolume Number Seven but were not the basis of any additional charges. According to Jenkins, the fact that the grand jury chose not to indict him on these two titles was "in essence" a finding by the grand jury that there was no probable cause to believe that they were obscene according to community standards. Hence, he argues, the trial court should have admitted these titles for the purpose of allowing the jury to make a comparison between them and Max Hardcore.
 {¶ 24} As this court has observed, "The defendant in an obscenity case must be allowed to introduce competent, relevant evidence bearing on the issues to be tried. [Citations omitted.] It is error for a trial court in an obscenity case to deny or unreasonably curtail a defendant's right to introduce into evidence competent and nonrepetitive testimony or exhibits that directly relate to or bear upon the absence of any or all of the elements of the Miller [v. California (1973), 413 U.S. 15, 93 S.Ct. 2607] obscenity test." State v. Dute (May 30, 2003), 1st Dist. No. C-020709, citing State ex rel. Leis v. William S. Barton Co., Inc. (1975),45 Ohio App.2d 249, 344 N.E.2d 342, and State v. Abrams (July 8, 1981), 1st Dist. No. C-800410.
 {¶ 25} In Dute, we recognized that videotapes that had been found not to be obscene by a Hamilton County petit jury "arguably demonstrate
contemporary community standards" and therefore should be admitted in an obscenity trial, but only if they are sufficiently similar to be considered a comparable material. Dute, supra. As Judge Winkler pointed out in his dissent in Dute, the United States Supreme Court has recognized that simply because material has been judicially determined not to be obscene does not necessarily make it relevant, mandating its admission. Id. (Winkler, J., dissenting, citing Hamling v. United States
[1974], 418 U.S. 87, 125-127, 94 S.Ct. 2887). And even if all or part of the material is relevant in the required sense, the trial court retains "considerable latitude * * * in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." Hamling at 126,94 S.Ct. 2887; see, also, State v. Abrams, supra.
 {¶ 26} Before discussing the videotapes, we observe that we do not necessarily accept Jenkins's argument that the grand jury's failure to return an indictment against him for the sale of Big Blacks LittleBlonds and Rogue Adventures No. 7 was tantamount to a finding that there was not probable cause to believe that the materials were obscene. Without the grand jury transcript, we cannot know why the grand jury chose not to indict him for the sale of these titles. Perhaps the grand jury simply chose to return an indictment only against the worst of what it considered to be an obscene lot. Further, even if it is assumed that the grand jury came to the conclusion that Jenkins proposes, such would not be tantamount to a judicial determination, similar to that of an acquittal by a petit jury, that the materials were not obscene.
 {¶ 27} As for the content of these two titles, we do not find them compellingly similar to Max Hardcore Extreme Volume Number Seven. BigBlacks Little Blonds is essentially a group of African-American males sitting around what appears to be a cot in a jail cell, looking particularly bored by their confinement. (As if to underscore this, one of them is indifferently dribbling a basketball.) Apparently in an effort to set the scene, the camera occasionally focuses on a clogged toilet inside the cell. At different intervals a blonde Caucasian female enters the picture and immediately submits to group sex with the lot. The sex is primarily vaginal and oral, but there are some scenes of anal penetration. There are several ejaculatory scenes (including one involving the woman's foot), but the videotape does not have the same fixation with anal penetration or "assream[ing]" as described on the carton of MaxHardcore. There are none of the same disturbing close-ups or the use of devices to stretch the female's bodily orifices. And there are no scenes to match those in the Max Hardcore videotape featuring the use of the speculum and the plastic tube.
 {¶ 28} Rogue Adventures No. 6 is another matter altogether. Shot in Brazil, it appears to be intended for a particular audience. Almost all the action involves sex between a young man and what at first appears to an attractive, scantily clad Brazilian woman who turns out to be either a man in drag or a pre-operative transsexual. Rather than being repulsed by this revelation, as in the movie The Crying Game, the man immediately engages in sex with the man/woman/transsexual (or "he/she" as the term was used at trial). The videotape concentrates heavily on oral sex between persons of dubious sexual orientation and gender, and although there may be some scenes of anal sex, the videotape has none of the same raunchy, close-up photography, orifice stretching, or use of bizarre devices that help Max Hardcore Extreme live up to its title.
 {¶ 29} It must be pointed out, further, that the trial court did allow Jenkins to introduce as a comparable the videotape Gangland 17, which is subtitled One Wrong Turn and Gang Banged. Unlike the other two videotapes, Gangland 17 had the distinction of being one of several titles involved in a prior, recently concluded Hamilton County prosecution, State v. Metcalf, Hamilton C.P. No. B-0009555, that resulted in the defendant's acquittal on the basis that the titles were not obscene. Hence, unlike Big Blacks Little Blonds and Rogue Adventures No.6, Gangland 17 could be legitimately described as having been judicially determined by a petit jury not to be obscene. Therefore, this film had particular relevance to the issues at trial, and the trial court allowed Jenkins the opportunity to play the videotape in its entirety so that he could argue that one title was no more sexually explicit than the other. It should be noted, finally, that like Max Hardcore, and unlike the other two videotapes, Gangland 17 features very close-up action of both vaginal and anal penetration. Indeed, the action in Gangland 17 is, in our opinion, much more sexually explicit and close to the edge of obscenity than either Big Blacks Little Blonds or Rogue Adventures No. 6, and therefore the trial court allowed Jenkins the use of what was undoubtedly his best comparable and his best argument.
 {¶ 30} In light of the trial court's decision to admit Gangland 17 as a comparable, we cannot say that its decision to exclude the other two videotapes was an abuse of discretion. As we have noted, the trial court has wide latitude in such matters. See Hamling and Abrams, supra. Because the two other videotapes had not been judicially determined either obscene or non-obscene, and because they were in many ways different in content than Max Hardcore, the trial court could have reasonably excluded them because of their potential to confuse the jury.
3. Alleged Prosecutorial Misconduct
 {¶ 31} Jenkins next argues that misconduct by the prosecution in its opening statement and closing argument rendered his trial fundamentally unfair. Specifically, he argues that the prosecution improperly (1) propounded to the jury in its opening statement an obscenity test based upon the standards of an average Kroger grocery-store customer; (2) urged the jury in closing argument to find him guilty not upon the law, but upon a concern that the community would be invaded by adult materials similar to Max Hardcore; and (3) misstated the law on community standards during closing argument.
 {¶ 32} As for the prosecution's reference in opening statement to a "Kroger test," we note that Jenkins did not lodge an objection, and, in fact, his own trial attorney picked up the phrase and used it in her own opening statement. Despite this lack of objection, the trial court, acting sua sponte, quickly corrected any misconception caused by the phrase, informing the jury that there was "no such a thing as the Kroger test." The trial court then briefly summarized for the jury the Miller test and added, "The point is, I am not sure that the people in Kroger represent the community. It's the community, not the people in Kroger's [sic] that will be the standard."
 {¶ 33} As for the prosecution's closing argument, it was concededly somewhat hysterical in tone. According to the prosecutor, who kept referring to the videotape as Planet Max,[3] Max Hardcore was "vile," "nasty," "gross," and "sick." He described it as featuring a "man slamming both his penis and a dildo into a woman's anus, causing her to scream in pain," and as showing Max "using a speculum cranking open a woman's anus." "Ladies and gentlemen," the prosecution told the jury, "if this is acceptable, then anything is."
 {¶ 34} Significantly, it was the trial court, acting sua sponte, that took the prosecution to task for some of its statements. When the prosecution informed the jurors that they were the "ones that get to set the standards," the trial court immediately intervened to make the correction that the jury determined community standards but did not "set" them. When the prosecution then sought to argue that the jury had to decide whether to police obscenity or let it be sold "wherever * * * whenever * * * anywhere in Hamilton County," the trial court again intervened sua sponte, warning the prosecutor that "public purpose arguments are out of order" and informing the jurors that they were under no duty "to reform the community." Finally, as soon as the prosecution concluded its argument, the trial court instructed the jurors to pay attention as it charged them on the law because "the statements made by the attorneys are improper representations of the law, and your duty in this case is to follow the law as I give it to you." The trial court added, "Just follow this because some of the argument was completely out of order."
 {¶ 35} We agree with the state that the remarks of which Jenkins complains were not the subject of objection and were cured by the trial court's own commendable efforts to remedy any impropriety. As Jenkins concedes in his brief, the touchstone of our analysis is not the culpability of the prosecutor, but, rather, what prejudice, if any, was visited upon the jury. See State v. Freeman (2000), 138 Ohio App.3d 408,419, 741 N.E.2d 566. Because of the trial court's efforts to keep the jury focused only upon the law given by the court, we perceive no prejudice to Jenkins as a result of the prosecution's remarks. Certainly we cannot conclude that the remarks undercut the fundamental fairness of the trial, nor can we conclude that any of the remarks that were not objected to constituted plain error under Crim.R. 52.
4. Jury Instructions
 {¶ 36} Jenkins next argues that the trial court made "several fundamental errors in instructing the jury," but he specifically identifies only two. First, he argues that the trial court improperly instructed the jury that community standards were to be based upon what was accepted in the community, rather than upon what was tolerated. In making this argument, Jenkins relies upon Smith v. United States (1977),431 U.S. 291, 97 S.Ct. 1756, as suggesting a semantic difference between "tolerate" and "accept." This argument has been rejected as "misplaced" by the United States Court of Appeals for the Sixth Circuit, see UnitedStates v. Battista (C.A.6, 1981), 646 F.2d 237, 245-246, certiorari denied sub nom. Peraino v. United States (1981), 454 U.S. 1046,102 S.Ct. 586, and other federal courts of appeals that have chosen to treat the two words as synonymous. See United States v. Easley (C.A.8, 1990), 927 F.2d 1442, 1447, listing cases. In Ohio, the Tenth Appellate District has also determined that the terms are interchangeable. Statev. Caudill (1991), 75 Ohio App.3d 322, 599 N.E.2d 395, motion to certify record denied (1991), 62 Ohio St.3d 1475, 581 N.E.2d 395. Our own review of the case law brings us to the same conclusion.
 {¶ 37} Jenkins next argues that the trial court erred by instructing the jury that he needed only to have been aware of the Max Hardcore
videotape's sexually explicit nature, and not its obscenity, to possess the necessary scienter. His argument relies solely on a passing footnote that appears in the dispositional paragraph of the Ohio Supreme Court's decision in State ex rel. Pizza v. Strope (1990), 54 Ohio St.3d 41, 47,560 N.E.2d 765, fn. 5. We agree with the state that the language and import of this footnote must be understood in light of the court's earlier decision in State v. Burgin (1978), 56 Ohio St.2d 354,384 N.E.2d 255, in which it fully analyzed the scienter requirement. The court concluded that knowledge of the character of the material was sufficient to convict a person of pandering obscenity, and that it was not necessary that the person know beforehand that the materials would be judicially determined obscene. Id. at 364, 384 N.E.2d 255.
5. Sufficiency of the Evidence
 {¶ 38} Finally, Jenkins argues that there was insufficient evidence upon which the jury could have concluded that Max Hardcore Extreme VolumeNumber Seven was obscene. Specifically, he challenges the evidence to support the two prongs of the Miller obscenity test — the "prurient-interest prong" and the "patently-offensive prong" — that are based upon community standards. In Jenkins's view, the foremost evidence of community standards presented to the jury was the videotape Gangland17 and the fact that another Hamilton County petit jury had refused to find a store owner guilty of pandering obscenity for selling this title. In Jenkins's view, Gangland 17 was "equally if not more graphic than the Max tape at issue here."
 {¶ 39} We agree with Jenkins that Gangland 17 shares some elements in common with Max Hardcore. Like Big Blacks Little Blonds, Gangland 17,
which has several unrelated segments, primarily involves scenes in which a Caucasian woman is shown having group sex with three or four African-American males. Unlike Big Blacks Little Blondes, and more likeMax Hardcore, Gangland 17 has abundant scenes of anal penetration as part of the group sex. In several scenes, the woman is shown simultaneously receiving anal and vaginal sex from two different men while at the same time performing oral sex on two others. And, again like Max Hardcore, the camera is often focused in close-up on the act of anal sex. The videotape also has a segment involving anal and vaginal sex with a single couple and, perhaps most disturbingly, a segment in which a physically underdeveloped and extremely young-looking female actress is shown wearing a schoolgirl outfit before being coaxed into sex with what appears to be a much older male actor. In our view, notwithstanding the actual age of the actress involved, the videotape is obviously implying sex with an underage schoolgirl.
 {¶ 40} To suggest, however, that Gangland 17 definitively established the nonobscene nature of Max Hardcore goes, in our view, too far. First,Max Hardcore has certain elements in it, which we need not repeat, thatGangland 17 does not. These elements are what they purport to be — extremely hardcore sexual activity. The camera angles and close-ups inMax Hardcore are more invasive than those in Gangland 17 and still manage to have more of a jarring effect. In some manner difficult to explain, the action in Max Hardcore manages to offend certain sensibilities and appeal to a certain level of prurience that Gangland 17 does not. Perhaps the best way to describe it is that Gangland 17, despite its graphic content, still seems to be about sex, while Max Hardcore seems to be about something else.
 {¶ 41} It should also be pointed out that the detective who purchased the Max Hardcore videotape testified that he picked the title off the shelf because he was already familiar with the Max Hardcore series. He testified that another title from the same production company, Planet Max5, had been the basis of a "successful" obscenity prosecution resulting in a plea of guilty to three counts of attempted pandering of obscenity by the former owner of Tip Top Video in July of 2001.[4] He testified that in the course of his career he had viewed approximately 40 or 50 pornographic videotapes. Asked to rate Max Hardcore Extreme Volume NumberSeven among the others he had viewed, he described it and Planet Max 5 as "heads and shoulders above the rest, they are very graphic, they are the worst I have seen." Asked for his opinion on other videotapes involving group sex, he stated that, although sexually explicit, "[t]he depiction of group sex is pretty normal in a lot of videos that I purchased in the course of my duties."[5]
 {¶ 42} It should be pointed out further that, aside from the detective, no other witnesses appeared at trial. In other words, neither side presented expert evidence on community values. However, expert testimony was not necessary to determine the obscene nature of MaxHardcore Extreme Volume Number Seven. As the Ohio Supreme Court has made clear, in an obscenity prosecution the allegedly obscene materials are "`the best evidence of what they represent'" and are "`sufficient in themselves for the determination'" of whether they are obscene. Urbana exrel. Newlin v. Downing (1989), 43 Ohio St.3d 109, 113, 539 N.E.2d 140, quoting Paris Adult Theatre I, supra, at 56, 93 S.Ct. 2628. See, also,Ginzburg v. United States (1966), 383 U.S. 463, 465, 86 S.Ct. 942. The only exception exists where the materials are "directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." Paris Adult Theatre I at 56, 93 S.Ct. 2628, fn. 6, citingMishkin v. New York (1966), 393 U.S. 502, 508-510, 86 S.Ct. 958. Ohio law is in accordance with this view. Newlin at 113, 539 N.E.2d 140.
 {¶ 43} Because Max Hardcore Extreme Volume Number Seven is not, in our view, directed toward "such a bizarre deviant sexual group" that expert testimony was required to judge its prurient appeal, the videotape itself was sufficient evidence that it violated community standards. Jenkins's argument concerning the comparative nature of Gangland 17 goes to the weight, not the sufficiency, of the evidence, and nowhere in his brief does he challenge his conviction as being contrary to the manifest weight of the evidence.
 {¶ 44} In sum, we conclude that there was sufficient evidence to convict Jenkins of pandering obscenity by selling the Max Hardcore
videotape.
6. De Novo Review
 {¶ 45} Finally, we note that although neither side has alluded to it in their briefs, this court is required to make an independent de novo review of the Max Hardcore videotape to protect the interests that underlie the First Amendment. See Strope, supra, at 45, 560 N.E.2d 765. In other words, our inquiry is not limited to whether the trial court's judgment is supported by sufficient evidence. Id. Rather, we have a duty to conduct an independent review "`to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited.'"Newlin, supra, at 115, 539 N.E.2d 140, quoting Bose Corp. v. ConsumerUnion of United States (1984), 466 U.S. 485, 505, 104 S.Ct. 1949.
 {¶ 46} By independent review, however, we do not mean to suggest that we are free to impose our own personal standards concerning obscenity. Just as there is no "Kroger test," there is no "appellate court test" for obscenity. Rather, when judges are asked to be the trier of fact in an obscenity case, their role, like that of the jury, is to "gauge the reaction of the community when and as if the `average person' viewed the material." Newlin, supra, at 113, citing United States v. 35mm ColorMotion Picture Film (C.A.2, 1974), 491 F.2d 956, 958. Among other things, we must ask ourselves whether the average person applying contemporary community standards "would find that the work appeals to the prurient interest." Newlin at 112, 539 N.E.2d 140, citing Miller, supra, at 24, 93 S.Ct. 2607.
 {¶ 47} We have viewed all the videotapes that were presented in the trial court and, at the risk of offending some readers, done our best to describe their content. We have read the record and carefully considered the arguments of the parties. In determining community standards, we are cognizant that Hamilton County consists of many different neighborhoods and a diversity of opinion on pornography, and that community standards on decency are not fixed or determined by any one group. We are guided by the principle that "the term `average person' does not include any number of people, the majority, or a few, or some, but is a term connoting a composite or synthesis of the community." United States v. Treatman
(C.A.8, 1975), 524 F.2d 320, 323, quoted in Newlin, supra, at 112,539 N.E.2d 140. "Qualitatively, the term average person does not mean the `abnormal adult of noxious tendencies or the person of defective or subnormal mentality.'" Id. at 112, 539 N.E.2d 140, quoting State ex rel.Beil v. Mahoning Valley Distrib. Agency, Inc. (C.P. 1960), 84 Ohio Law Abs. 427, 440, 169 N.E.2d 48. "For purposes of the Miller test, the average person is one with average sex instincts." Newlin at 112, citingVolanksi v. United States (C.A.6, 1957), 246 F.2d 842, 844.
 {¶ 48} We conclude that Max Hardcore Extreme Volume Number Seven is obscene by the standards of the average person in Hamilton County. In making this determination, we are not unmindful that a Hamilton County petit jury has determined that Gangland 17 is not obscene. Jenkins is correct to argue that the jury verdict involving Gangland 17 is significant evidence of the non-obscene nature of the Max Hardcore
videotape. But the two videotapes, while comparable, are not altogether alike. As we have noted, there are elements in the Max Hardcore videotape that seem to go beyond recreational sex to sexual defilement. The average person in the community, we believe, would not find such imagery acceptable. Further, while a jury drawn from the citizenry of this county has found Gangland 17 not to be obscene, the jury in this case, after comparing the two videotapes, found the Max Hardcore tape to be obscene. Without deferring to the jury's judgment since our review is de novo, we still consider the jury's verdict in this case, the unanimous decision of twelve Hamilton County citizens, evidence of the average person's reaction to the content of the Max Hardcore videotape. Further, we are convinced in our own minds that the composite average person of this community would conclude under the Miller test that the videotape depicts, in a patently offensive way, sexual conduct specifically defined by statute; that, under contemporary community standards, the work, taken as a whole, appeals to the prurient interest; and that, taken as a whole, the work lacks serious literary, artistic, political, or scientific value.
 {¶ 49} Accordingly, because his conviction was in accordance with Ohio law and consistent with constitutional principles, we overrule Jenkins's general assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Hildebrandt, P.J., and Doan, J., concur.
[1] We note that Jenkins's appellate brief is not in compliance with the rules of this court that require it to have a table of contents and to set forth assignments of error. Loc.R. 6 of the First Appellate District of Ohio. We treat his arguments as falling under one general assignment of error challenging his conviction.
[2] It should be pointed out that although we have quoted the carton of the videotape because it is part of the evidence, we consider only the content of the videotape, not its packaging, in determining the issue of obscenity.
[3] The detective who purchased the Max Hardcore videotape from Tip Top Video testified that he was familiar with the series and referred to an earlier volume as "Planet Max," which appears to have been the source of the prosecution's errant use of the title for Max Hardcore Extreme VolumeNumber Seven.
[4] During cross-examination, Jenkins's attorney was able to suggest through questioning that the former owner had decided to sell the business and had pleaded guilty to the obscenity charges as a cost-saving measure.
[5] The detective admitted, however, on cross-examination, that he had never conducted any public-opinion polls or surveys in order to gauge community standards on pornography and obscenity. Indeed, the detective testified that he had not made any special effort, aside from his own experiences, to educate himself on the subject of community values.